**EMPLOYERS CASUALTY COMPANY,**
a corporation, Appellant,

v.

**D. P. WINSLOW and Dorothy Winslow, Individually and d/b/a Presidio Mineral Products, et al., Appellees.**

No. 5485.

Court of Civil Appeals of Texas.

El Paso.

March 28, 1962.

Rehearing Denied April 18, 1962.

———◆———

Edwards, Belk, Hunter & Kerr, El Paso, for appellant.

H. O. Metcalfe, Wm. H. Earney, Marfa, Joseph L. Dunigan, Potash, Cameron, Potash & Bernat, Don Studdard, El Paso, for appellees.

CLAYTON, Justice.

This is an appeal from a judgment of the District Court of Presidio County rendered in favor of the plaintiffs (appellees) in the amount of $100,000.00 against the defendant insurance company (appellant). The parties will be referred to as they appeared in the trial court, wherever possible. Suit was on an alleged oral policy of fire insurance said to have been contracted for by the defendant, covering an ore mill and equipment which plaintiffs had erected in Presidio County. Construction was started on the mill about the first of January, 1958 and continued until about May of that year. At or near the beginning of construction the Winslows contacted one J. W. Davis, an employee of the defendant company, and discussed with him the matter of Workmen's Compensation and Liability insurance. Pursuant to this conversation a "Comprehensive General Liability Policy" was issued to D. P. Winslow d/b/a Presidio Mineral Products by the defendant company for the period from January 20, 1958 to January 20, 1959. A similar policy was issued by defendant company for the period January 20, 1959 to January 20, 1960. On June 13, 1958 a "Standard Automobile Policy" containing Fleet Certificates covering various vehicles being used by plaintiff Winslow was issued by defendant company for a period of one year, followed by a similar policy for the ensuing year ending June 13, 1960. All of these policies contained the printed heading "Employers Casualty Company" and the printed signatures of the President and Secretary of the company at the end of the policies, under a printed paragraph reading:

"In Witness Whereof, the company has caused this policy to be executed by its President and Secretary, but this policy shall not be valid unless countersigned on the declarations page by a duly authorized representative of the company."

The declarations pages of the two liability policies each contained the legend "COUNTERSIGNED AT El Paso, Texas BY (followed by the written signature of J. W. Davis) AUTHORIZED REPRESENTATIVE." The declaration pages of the automobile policies merely contained the written signature of J. W. Davis under the title "Authorized Representative". Riders attached to these latter policies contained the signature of J. W. Davis and the printed wording "Duly Authorized Representative."

These policies were mailed to the insured and premiums were paid when the insured could—some in full and some not.

At a point after construction was started on the mill, about the middle of 1958, Mrs.

Winslow started talking to Davis about fire insurance. As a result of these conversations the Employers Casualty Company issued a "Binder" effective at noon on November 29, 1958 and for a period not in excess of thirty days thereafter covering loss or damage by fire and extended coverage on the ore mill in the amount of $50,000.00. The value of the property was listed as $60,-000.00. The fire and extended coverage binder was subject to all the terms and provisions of a Texas Standard Policy. The binder was counter-signed by Jack A. White, "Authorized Representative." A second binder was issued effective December 29, 1958 for another thirty-day period and was in the same terms and conditions as the first. A third similar binder covered the thirty-day period from January 29, 1959. These latter two binders were counter-signed by L. H. Swager, "Authorized Representative."

No policies of insurance were issued on these binders, and no premiums were paid on them. Mr. Davis, testifying for the defendant, stated that before a policy could have been issued it would have been necessary to submit to his company and through it to the Texas Insurance Commission the required information as to the risk so that the policy could be "rated", since it would not be on the regular rate. Had a policy been rated and issued the premium would then relate back to the original issuance of a binder.

In this respect, Davis' testimony seems to be borne out by that of Mrs. Winslow, who testified that in conversations had with Davis during the time the binders were issued, she was told that the exact amount of the premiums could not be given, but could be approximated only, until the policy could be rated; and that Davis made an estimate of premium cost based on $50,000.00 of insurance. This estimate was written by Davis on a slip of paper, introduced by plaintiffs as an exhibit, and is as follows:

"PLAINTIFFS' EXHIBIT 14, EH

"Fire
"50,000 @ 1.00 per 100 = 500.00
"EC
"50,000 @ 32 = 160.00

Between $\left\{\begin{array}{l} 660.00 \\ \text{and} \\ 800.00 \end{array}\right.$

"1.50
"Per 100—
      Rate
"Fire
"20,000 @ 1.00 per 100 = 200.00
"EC Cov
"20,000 @ .32 = 64.00
                          264.00
                          1 yr.

"4X annual
"5 yrs          1320.00

"Could be around 364.00
      because of location."

Mrs. Winslow testified that after these binders had been issued and the mill had been constructed up to a point, it was necessary to close down and Mr. Davis was informed that no more insurance was needed until they were ready to start up, at which time they would contact Davis again and make arrangements for the fire insurance policy. She further testified that some time in April, 1959, other persons made investments in enlarging the plant and machinery and beginning that month she had several conversations with Davis relative to a fire insurance policy in the amount of $100,-000.00. She stated that from time to time Davis would request further information regarding the plant, which information she claims to have given him, together with pictures of the plant taken during construction. As regards the other investors, she claims that Davis said their names would not be necessary until after a contemplated incorporation had been completed and the plant was no longer operating under the

name of Presidio Mineral Products, at which time the policy would be changed to show the corporate name and the investors.

There is a great deal of divergence between the testimony of Mrs. Winslow and that of Davis, but Mrs. Winslow testified that during the summer of 1959 Mr. Davis, who was about to leave on vacation, called her and told her he had all the information and everything he needed and that if the Winslows wanted to go ahead with the insurance while he was away, all they had to do was put in a telephone call to his office telling when they wanted the insurance to go into effect and the office would take care of it.

Winslow testified that his wife had related to him the substance of her conversations with Davis, and then she was called to California in July of 1959 due to the illness of her mother. He further stated that on August 7, 1959 he had left a check for $500.00 with the receptionist in Mr. Davis' office and asked that it be put on Davis' desk, since Davis was out of the office at the time. Mr. Winslow was asked how he had arrived at the figure of $500.00 and he testified:

"A. The only thing I had in writing from Mr. Davis indicated that the rate for $50,000.00 insurance would be from $600.00 to $800.00 per year and since we were getting going, on a yearly basis $500.00 represented, roughly, one-third of the rate that had been indicated."

Referring to Mr. Davis' notations which were shown on plaintiff's Exhibit 14, the rate indicated for $50,000.00 Fire and Extended Coverage was between $660.00 and $800.00 per year. For $100,000.00 insurance this notation could indicate to Winslow a premium double the one shown, or a rate between $1320 and $1600, of which $500.00 would represent, roughly, one-third. That this was what the notations meant to Winslow seems to be substantiated by his testimony that at the time the $500.00 check was given, he had "the whole $1600.00" in the bank in the account of the Presidio Mineral Products; and further: "I had the money, $1600.00, for the policy at the time, but you have to multiply your money a little bit. I never have contracted for something I couldn't financially complete, and when I took the money in there I was ready to complete it."

The $500.00 check was offered in evidence and is as follows:

"THE STATE NATIONAL BANK OF EL PASO

El Paso, Texas, August 7, 1959 19____ No. ____

"Pay to the order of _____. $500.00

Five Hundred and no/100------------------------------------Dollars.

Presidio Mineral Products

Wind and Fire Ply.                    D. P. Winslow

"ENDORSED: For deposit only. Texas Employers' Insurance Association, Employers Casualty Company, Employers National Insurance Company.

"Pay to the order of any Bank or Banker or through El Paso Clearing House, August 7 59 26522. Prior endorsements guaranteed. The State National Bank of El Paso, El Paso, Texas 88–6.

88–15 Pay to the order of Any Bank, Banker or Trust Co. Prior endorsements guaranteed. Aug. 26 '59 27069. El Paso National Bank, El Paso, Texas.

PERFORATED:        8–27–59        88–6"

Mr. Winslow, continuing his testimony, related the following as having occurred on August 7, 1959:

"Q. Did you later that day talk to Mr. Davis?

"A. Yes, Mr. Davis called me at home that evening, I presume when he got back to the office and I said that we were going now, after two years we were finally rolling, and I wanted the insurance which we had furnished him all the information for and he said all right, and I said 'Am I covered?' and he said 'Yes' and we got to talking about fire extinguishers, and he said 'You should have them, but they aren't necessary' and I said 'Well, I have two or three fire extinguishers that have been discharged and I will get them charged and send the certificates to you.'

"Q. Did he say anything to you about returning the premium, or anything like that?

"A. No, he said he would complete the rating and send the policy and bill us for the balance, like he did for a multitude of other policies."

The ore mill was destroyed by fire on September 14, 1959. An itemization of the value of the mill and equipment was introduced and testified to by plaintiff Winslow. The replacement cost was given as $135,000.00 and this figure was corroborated by other testimony.

Defendant company denied liability and on October 19, 1959, by registered letter of that date on Employers Casualty Company stationery, forwarded to Winslow a company check with the message: "We hand you herewith check for $500.00 which was conditionally left with our cashier on or about August 7, 1959." This check was not cashed but the tender was again made by defendant after this suit was filed, by payment into the Clerk of the Court.

This case was submitted to a jury on special issues. The jury found that the defendant, through J. W. Davis as agent, entered into an oral contract with plaintiff D. P. Winslow on or about August 7, 1959 to insure the building and machinery of Presidio Mineral Products against loss or damage by fire for one year in the amount of $100,000.00; that Davis had, at the time the contract was made, "apparent authority" from the defendant to make such contract; that the building and machinery were a total loss; that on or prior to August 7, 1959 the plaintiffs gave to defendant the names of the parties who were sought to be insured for $100,000.00; that defendant was also informed to whom the loss, if any, was to be payable; that an agreement was reached between plaintiffs and Davis as to the amount of the premium on such a policy of $100,000, and the company or companies which would issue the policy or policies; and that the plaintiffs D. P. Winslow and Dorothy Winslow did not willfully conceal from defendant the fact that other persons owned an interest in Presidio Mineral Products.

Upon these findings of the jury the trial court, after overruling defendant's motion for judgment non obstante veredicto, rendered judgment for plaintiffs in the principal sum of $100,000.00, from which judgment this appeal has been perfected.

■■■ Appellant in this appeal contends, under Point I(1) that the evidence fails to show that there was any contract to insure made between defendant and plaintiffs. It is the settled law of this state that parol contracts to effect insurance by issuance of a policy are valid and enforceable. Springfield Fire & Marine Ins. Co. v. Hubbs-Johnson Motor Co., 42 S.W.2d 248 (Tex.Com. App.), and authorities there cited. There seems to be no issue between the parties in this case on the above rule of law, nor on the further rule set out in the Springfield case that "The contract must be in such condition that nothing is left open for future

negotiations with reference to the subject-matter, parties, rate of premium, amount, or duration of risk."

The subject-matter to be insured appears to have been known to the parties as a result of prior negotiations, and the defendant admits that "it may be said that from the evidence one may gather that the minds of the parties met on * * * the amount of insurance, if there was to be any insurance * * *." From what has been said above, we conclude that the jury had sufficient basis in the evidence to find that the amount of the purported policy of insurance was to be $100,000. But defendant urges that the "plaintiffs wholly failed to show what kind of a policy, if any, was to be issued, or who were to be the parties to the contract, or the rate of premium, or the duration of the risk."

As to what kind of a policy was to be issued, defendant points to the testimony of Mrs. Winslow on direct examination, as follows:

"Q. And how much fire insurance did you request?

"A. A $100,000.00 replacement policy."

The defendant urges that by such a policy the insurer agrees to pay to the insured, in case of loss, the cost of replacing the damaged property up to the policy limits, while under a Texas Standard Fire Policy the company is required to pay only the difference between the value of the property immediately before and immediately after the fire, "except in case of a total loss where the amount of the policy creates a liquidated demand."

The Texas Insurance Code, Article 6.13, Vernon's Annotated Texas Statutes, provides:

"A fire insurance policy, in case of a total loss by fire of property insured, shall be held and considered to be a liquidated demand against the company for the full amount of such policy."

It appears from the record in this case that the loss by fire of the mill property was in excess of $100,000.00. A witness for the plaintiff estimated that the replacement cost would be in the neighborhood of $150,000.00, give or take ten per cent. He gave about the same estimate of the fair market value of the mill as of September, 1959, before the fire which occurred on September 14, 1959. He stated that after the fire, what was left was "just junk", worth about $30.00 a ton for the iron, and that there "might be fifteen or twenty tons" left. Another witness for the plaintiff, who was a mill construction contractor and who had constructed this mill, testified that the mill, after the fire, "looked to me like it was a complete loss." This testimony was uncontroverted in the record.

The jury found that the building and machinery were a total loss, and we feel that the jury was justified in so finding. (See E. L. Crutchfield, et al., v. St. Paul Fire & Marine Insurance Company, Tex. Civ.App., 306 S.W.2d 948). It therefore follows that whether the insurance requested by Mrs. Winslow was a replacement policy or a Texas Standard Fire Policy, the liability of the defendant would be a liquidated demand for the full amount of the policy—in this case, $100,000.00—if it is found that a valid parol contract of fire insurance was in fact entered into by defendant company.

■ The next complaint of the defendant is that the plaintiffs failed to show who were to be the parties to the insurance contract; that is, who were to be the insurer and the insured. When Winslow made out the $500.00 check which he left for Davis, the name of the payee was left blank. The check, however, was endorsed by the Texas Employers' Insurance Association, Employers Casualty Company and Employers National Insurance Company. Winslow testified that he did not fill out the name of the payee in the check because "I didn't know which of these three companies our various policies were with", but that "I would as-

sume that he (Davis) would know which company to put it in." The proof shows that the three binders of insurance against loss by fire and extended coverage in the amount of $50,000.00 each had been issued by the Employers Casualty Company, as had the Comprehensive General Liability policies and the Standard Automobile policies. Appellant urges that under these facts "the minds of Davis and Winslow did not meet on the question of who were going to be the parties to the contract as insurer", and cites the cases of Springfield Fire & Marine Insurance Co. v. Hubbs-Johnson Motor Co. (supra), and Grimes v. Virginia Fire & Marine Ins. Co., Tex.Civ.App., 218 S.W. 810, as authorities for the principle that where an agent may place the risk with any one of several companies, an oral contract of fire insurance is not enforceable if the contract does not itself specify which of the companies will carry the risk. This is true, "but, where the agent selects a company, a binding contract results, even though there was no agreement between the agent and insured as to the particular company to carry the risk, and insurer's liability is unaffected by insured not knowing with what company he was dealing when agreeing with the agent for insurance." (44 C.J.S. Insurance § 238, p. 995).

Winslow had the right to conclude that the same company that wrote the binders for fire and extended coverage, as well as his other policies, would write the requested policy for which he left his $500.00 check, even though the name of the company escaped him at the time; and it was that company (appellant herein) which was one of the endorsers on his check and who later, after the fire, tendered a return of this premium payment to Winslow. We feel that there was a meeting of minds as to the intended insurer, and the jury so found.

Appellant next claims that there was no contract of insurance between Davis and Winslow on August 7, 1959 "because of the additional reason that. there was no meeting of their minds as to who would be in-

sured." Although the testimony is not without conflict, it can be fairly said that in conversations between Mrs. Winslow and Davis, the latter learned· that there were to be other investors in the property to enlarge the plant and put it back in operation, and that it was contemplated that a corporation would be formed. Davis was asked the question whether he told the Winslows, in connection with the formation of the corporation: "At that time let me know and we will change the name of the insured in the policy", to which he replied: "I told them we would, if the policy was issued." The corporation was never formed. On April 1, 1959 an agreement was entered into between Winslow and three other persons concerning certain investments the latter were to make in the mill, after which a corporation was to be formed wherein Winslow was to have a 51% interest and the others, jointly, a 49% interest. Preliminary incorporation papers were drawn up but were not executed for the reason, according to Winslow, that the agreement of the investors had not been fully performed. These papers seemed to indicate that, in addition to the Winslows, there were three later investors who had either transferred, or intended to transfer to others, a part of their proposed interest in the intended corporation. All of these negotiations were not explained in detail to Davis. Mrs. Winslow testified that when she started to name off the investors Davis said it was "not necessary until the name of the company was changed, until we were incorporated." The jury found there was no willful concealment from Davis by the Winslows of other persons who owned an interest in Presidio Mineral Products. Further, that prior to or on August 7, 1959 the plaintiffs gave to defendant the names of the parties who were sought to be insured for $100,000.00. This finding can be justified on the basis that, as far as the record shows, D. P. Winslow was still doing business as Presidio Mineral Products. Without in any way taking issue with the holding of the Commission of Appeals, in Franklin Fire Insurance Co.

v. Shadid, 68 S.W.2d 1030, that "contracts for insurance against fire are personal in their nature", and that "the insurer is entitled to know whose property he is insuring", we hold that the jury's answers to the above two issues are supported by the evidence.

Appellant next maintains that there was no contract of insurance because there was no meeting of the minds as to the period of time for which the insurance was to run. From a further glance at plaintiff's Exhibit 14, supra, which is the notation of estimated rates made by Davis for $50,000.00 Fire and Extended Coverage on a yearly basis, together with Winslow's testimony that "on a yearly basis $500.00 represented, roughly, one-third of the rate that had been indicated" for $100,000.00 coverage, it seems clear that Winslow intended to make a payment on one year's premium and that his calculations were based on figures furnished by Davis for a one year's premium. The jury found that the contract was for one year's duration and it is believed that the testimony bears out this conclusion.

If we are correct in our reasoning in the above respect, the same reasoning would apply to appellant's next contention, namely, that there was no agreement as to the amount of the premium. Davis had furnished Mrs. Winslow with a notation of estimated premiums, on the basis of which Winslow had drawn and delivered his $500.00 check. On the evening of the same day the check was delivered he had a telephone conversation with Davis, and as to this conversation he testified that he asked Davis, "Am I covered?", and that Davis had replied "Yes." Winslow was asked if Davis had said anything about returning the premium, or anything like that, and Winslow replied, "No, he said he would complete the rating and send the policy and bill us for the balance, like he did for a multitude of other policies."

■ An agreement relative to the amount of insurance, amount of premium, and duration of risk, need not be expressed in order to render the contract effective, but may be implied from previous dealings between the parties, if such have occurred, and surrounding circumstances. (24–B Tex.Jur. § 7, p. 40). In the instant case there had been previous dealings between the parties and it could be expected that the present transaction relative to fire insurance would follow the same pattern, and that the policy would be issued and Winslow would be billed for the balance of premium due in accordance with the rate approved by the Texas Insurance Commission.

■ We feel compelled to overrule all the issues raised by appellant under its Point I(1).

Under Point I(2), Point I(3) and Point I(4), appellant urges that if Davis made a contract with Winslow, which is denied, he acted without actual, implied or apparent authority to do so; and under Point I(5), that there was no evidence of ratification of such action by the Company.

It is quite possible that Davis did not have actual authority from the defendant company to enter into the claimed policy of fire insurance with the Winslows. His "Salesman's Employment Contract" introduced in evidence, contains the following provision:

"* * * and the Salesman shall submit each and every such * * * application for Casualty business to the Casualty Company, and the * * * Casualty Company * * * to whom any such application is so submitted shall have the absolute right to accept or reject the same."

■ However, there is no showing that the Winslows knew of such provision or were aware of any limitation on Davis' authority except, perhaps, that he may have expressed to Mrs. Winslow some doubt as to whether his company would write a fire policy for $100,000.00. The rights of the parties to a contract of insurance are to be determined primarily with a view to the

agent's *apparent* authority, unrestricted by instructions of the principal which are not shown to have been known by or communicated to the insured. 24–B Tex.Jur. 262, Sec. 116. (Emphasis supplied).

We feel that there was no *implied authority,* as distinguished from *apparent authority,* from the defendant company to Davis to enter into the claimed insurance policy, since the definition in this State of implied authority seems to be that which is proper, usual and necessary to the exercise of the authority that has been expressly granted an agent. National Cash Register Co. v. Wichita Frozen Food Lockers, Tex.Civ.App., 172 S.W.2d 781, affirmed 142 Tex. 109, 176 S.W.2d 161. The definite restrictions on Davis' authority under his employment contract with defendant precludes, we believe, any implied authority on his part to enter into the asserted contract.

We must, therefore, inquire as to whether there was apparent authority for Davis to bind the defendant. Both appellant and appellees rely upon the opinion in Great American Casualty Co. v. Eichelberger, Tex. Civ.App., 37 S.W.2d 1050, for a definition of apparent authority and what it embodies. This case holds:

"By apparent authority is meant such authority as a reasonably prudent man, using diligence and discretion in view of the principal's conduct, would naturally and reasonably suppose the agent to possess. * * * An agent, who is clothed with the apparent authority, may make a binding contract, although his authority is actually so limited as not to authorize the making of such contract. * * * If a principal, acting through agents, invests such agent with the apparent authority, the acts of the agent in making a contract within the scope of his apparent authority is as binding upon the principal as if the agent possessed such authority. * * *

"Apparent authority is based on estoppel, and can arise from but two sources: First, the principal may knowingly permit the agent to so hold himself out as having such authority, and in this way the principal becomes estopped to claim that the agent does not have such authority. * * * Second, the principal may so clothe the agent with the indicia of authority as to lead a reasonably prudent person to believe that he actually has such authority."

At the beginning of the insurance transactions between the Winslows and Davis, two Comprehensive General Liability Polices were issued by the defendant company covering the two-year period from January 20, 1958 to January 20, 1960. Two Standard Automobile Policies were issued by the company covering the two-year period from June 13, 1958 to June 13, 1960. All four policies were headed "Employers Casualty Company, Dallas, Texas"; all bore a printed "sticker" reciting "El Paso District Office, 526 East Yandell Blvd., Phone: KE 3–4401, El Paso, Texas"; all bore a rubber stamp "Wilson Davis, Representative" with a business phone number the same as on the sticker; each bore the printed signatures of the President and Secretary of the company under a paragraph reciting that the policy would not be valid unless counter-signed by a "duly authorized representative of the company"; and all contained the hand-written signatures of J. W. Davis, variously described as "Authorized Representative" or "Duly Authorized Representative." His were the only hand-written signatures on the policies.

Later, three 30-day "binders" were issued by defendant company covering fire and extended coverage in the amount of $50,-000. These binders contained the recital that they were "not valid unless countersigned by the Company's duly authorized representative." These binders bore hand-written signatures of persons other than Davis, but each of such persons was designated on the binders as an "Authorized Representative", just as Davis had been.

Mrs. Winslow testified that she had several conversations with Davis concerning a fire policy in the amount of $100,000.00, and that she had furnished him information as requested from time to time. She swore that Davis had finally said he had all the information he needed and if the Winslows wanted to go ahead with the policy while he was out of town, his office would take care of it. Mr. Winslow, employing figures furnished by Davis, left a $500.00 check for Davis to apply on the premium of such a policy, and when he inquired of Davis, "Am I covered?", Davis replied that he was. The check was endorsed by defendant company and deposited on August 7, 1959—the day of its date.

Amid such circumstances, on September 14, 1959 the ore mill sought to be insured was destroyed by fire. By covering letter of October 19, 1959 (over nine weeks from the time when the defendant company had received and deposited Winslow's check, and over a month from the time of the fire), the defendant sent its check in the amount of $500.00 to Winslow, apparently as a tender of return of the amount paid on the premium. There was evidence to the effect that the defendant had accepted partial payments on premiums which became due during the course of dealings between Davis and Winslow.

█ The issue of Davis' "apparent authority" was submitted to the jury with an explanatory instruction which used substantially the same definition of "apparent authority" as approved in the Eichelberger case, supra. The jury found that Davis had such authority. We hold that the jury was justified in so finding.

The foregoing conclusion eliminates the necessity of any discussion relative to ratification, and appellant's Points I(4) and I(5) are accordingly overruled; and although Points I(2) and I(3) are sustained, our holding that Davis acted under apparent authority from defendant is unaffected thereby.

Under Point II, appellant asserts that the verdict does not support the judgment, and that therein lies fundamental error.

This case was submitted to the jury on special issues. Special Issue Number 3 asked: "Do you find from a preponderance of the evidence that the damage to Plaintiffs' building and machinery constituted a total loss?" A proper instruction defining "total loss" was submitted with the issue. The jury found the damage to be a total loss. Special Issues Numbers 4 (repair and replacement cost), 4–A (actual cash value of building and machinery immediately before the fire), and 4–B (actual cash value immediately after the fire) were submitted conditioned upon a finding of damage not a total loss, and were unanswered. Appellant maintains that the last three issues having been submitted conditionally and left unanswered, there was no finding as to the amount of damage actually sustained. It relies upon the use of the word "policy" in Article 6.13 of the Texas Insurance Code making a total loss a liquidated demand as taking this case out of the provisions of the statute. Wise v. Ferguson, Tex.Civ.App., 138 S.W. 816 is cited in support of this contention. The decision in the cited case was based on a cross-action alleging breach of a contract, not of insurance, but to renew or procure new insurance. The instant case, as appellant points out in his brief, is a suit "on an alleged oral contract of fire insurance". We do not feel that the Wise case is applicable. Furthermore, the words "policy" and "contract" are often used synonymously. Again referring to the Texas Insurance Code, Article 21.42 thereof is headed: "Texas Laws Govern Policies". The article begins: "Any *contract* of insurance", and further in the article: "notwithstanding such *policy* or *contract* of insurance * * *." (Emphasis added).

█ At another point in this opinion a discussion is had of the uncontroverted testimony relative to replacement cost of the mill and machinery after the fire, and the actual value of this property before and

after the fire. Being uncontroverted questions of fact, these matters need not have been submitted to the jury. If, as submitted, they were improperly conditioned, objection should have been made to the manner of submission. If the jury, acting under the instructions of the court, failed to answer these issues as conditioned, and if such failure constituted "omitted issues", a request for written findings on such issues should have been made, and in the absence of such request, such issues, if "omitted" shall be deemed as found by the court in such manner as to support the judgment.

Rule 279, Texas Rules of Civil Procedure.

Finding no merit to appellant's Point II, the same is overruled, and the judgment of the trial court is in all things affirmed.