**EXPORT INSURANCE COMPANY et al.,**
**Appellants,**

**v.**

**Ricardo HERRERA, Appellee.**

**No. 355.**

Court of Civil Appeals of Texas.

Corpus Christi.

March 29, 1968.

Rehearing Denied April 18, 1968.

King, Sharfstein & Rienstra, John D. Rienstra, Beaumont, for appellants.

Greenwood & Russell, Merrill W. Russell, Jr., Harlingen, for appellee.

## OPINION

NYE, Justice.

This is a suit based on an oral contract of insurance. The appellee Ricardo Herrera brought suit against defendants Export Insurance Company, Aviation Office of America, Inc., and L. R. Baker, doing business as L. R. Baker Insurance Agency, for actual damages based on the contract of insurance, and exemplary damages based on fraud. The jury awarded the full amount of the insurance loss of $15,500.00 and in addition $7,500.00 as exemplary damages. The trial court on motion disregarded jury findings of $3,000.00 for loss of use.

Ricardo Herrera, hereafter referred to as "Herrera" went to an insurance agent, L. R. Baker (referred for convenience hereafter as "Baker") to purchase insurance on two airplanes. One policy of insurance was for a period of one year and covered a Piper Comanche airplane not involved in this appeal. The other was "trip insurance" to cover a Grumman Agcat airplane while it was being moved from the country of Guatemala to United States at San Benito, Texas. The terms of Herrera's offer to purchase the insurance were undisputed. Baker was a soliciting agent for Export Insurance Company without authority to accept or bind Herrera's offer, but had to get approval and quotation of premiums from Aviation Office of America, Inc. which was the aviation insurance manager for Export Insurance Company in the State of Texas. Defendants Export Insurance Company and Aviation Office of America, Inc. for a matter of easy identification will be referred to as "Export" and "AOA" respectively. While Herrera was in Baker's insurance office Baker called AOA and talked to its president Jack Folmar, detailing to Folmar the pro-

posal for insurance on both airplanes. Although some of the details of the telephone conversation were in dispute, defendant Baker testified, and such testimony was corroborated by Herrera, that he asked President Folmar for a one year coverage on the Comanche airplane and "trip insurance" on the Grumman Agcat for the trip from Guatemala to San Benito, both coverages to be effective on January 10, 1966. Baker testified that President Folmar accepted the requested coverages, including specifically the "trip insurance" on the Agcat and quoted the premium charges which Baker relayed to Herrera who was standing by and who approved the same. The insurance was then accordingly placed. Baker collected $908.00 in premiums from Herrera including $90.00 for the trip insurance on the Agcat. After the telephone conversation had been completed, Herrera decided that it would be best to have immediate coverage on the Comanche airplane, but that the coverage on the Agcat should continue to be effective four days hence on January 10 as he couldn't get back down to Guatemala before then. Baker then sent a telegram to President Folmar which advised AOA: "Please make Ricardo Herrera policy covering Comanche plane effective today (January 6th). Trip insurance on Agcat effective January 10th as advised."

Herrera employed a ferry pilot to fly the Agcat airplane from Guatemala to the United States. The ferry pilot left Brownsville on January 11. As soon as he arrived in Guatemala he began preparing the airplane for its ferry trip to the United States. This type of airplane was designed to be used for agricultural crop dusting and was not equipped for night flight or for long non-stop trips. However, by installing a special fuel transfer pump, gasoline could be put in the insecticide hopper and transferred to the regular gas tank while in flight, thereby permitting a longer non-stop trip. The plane normally flew at a speed of 75 to 80 miles an hour. The pilot left Guatemala on the morning of January 13. Late that afternoon he experienced difficulty in the gasoline transfer system, and after making one emergency stop, landed that evening in Vera Cruz, Mexico, where he stayed all night. This was about half way or five hundred miles from his destination. The next day the wind was blowing from the north with gusts up to fifty miles an hour. Because of the slow speed of the Agcat, the ferry pilot did not fly on the 14th.

On the 15th he left Vera Cruz and again experienced fuel transfer difficulties. Soon, because of a low fuel supply, the pilot was forced to land on the beach of the Gulf of Mexico, at Mack's Fishing Camp just north of La Pesca to try and repair the fuel transfer pump. The plane, however, caught on fire and was destroyed. This occurred on Saturday, January 15. On Sunday morning, the 16th, Herrera reported to authorities that the plane was missing and unaccounted for. Early Monday morning, the 17th, one of Herrera's employees reported to Baker that the pilot had been recovered, although the plane had been destroyed by fire. Baker then, in the presence of Herrera's employee, reported the loss to AOA. AOA reported to Baker over the telephone that there was no coverage on the plane, as the insurance was for one day only, January 10. Herrera's employee, becoming inquisitive and suspicious of the conversation, listened in on an extension phone and learned from the conversation between Baker and AOA's agent that the policy of insurance had not then been mailed. The insurance policy was received the next day, January 18, dated January 14, and written to show that coverage on the Agcat was for January 10 only.

Folmar, President of AOA, testified that the coverage approved by him for the Agcat was for one day only, a 24-hour period. On cross examination it was brought out that Folmar was an experienced pilot and was familiar with Agcat airplanes, their slow speed and inability to fly legally at night. Several witnesses testified and Folmar admitted that it would be impossible for the Agcat airplane to fly legally from

Guatemala to Texas in one day during daylight hours. Herrera testified, and Baker substantiated Herrera, that ferry flight insurance for a specified trip from Guatemala to San Benito was ordered from Folmar, president of AOA. Folmar admitted on cross examination that the insurance coverage was for a specified trip. Both Herrera and Baker stated on the other hand, that they did not tell Folmar how long the trip would take but they didn't think that this was necessary since they were ordering "trip insurance". Herrera testified that it was impossible to determine with any degree of certainty when the trip could be made or how long it would take, because of weather and other factors, but that he had told Baker that the earliest possible date that he could make arrangements for the flight from Guatemala, would be around January 10. It is undisputed that Baker sent the telegram to Folmar specifying "trip insurance effective January 10th." The overwhelming, almost unanimous testimony, by expert witnesses was that "trip insurance" meant coverage on an airplane and its contents from the point of departure to its arrival at its destination, so long as the trip was made within a reasonable time, usually thirty days. Although Folmar had been in the aviation insurance business for a long time, he denied writing any of this type of insurance before this occasion.

The jury in response to certain special issues found that the term "trip insurance" had a usual and customary meaning in the aviation insurance industry as being insurance coverage for a specified trip to be taken from a point of beginning to a point of destination within a reasonable length of time not to exceed thirty days. The jury further found that President Folmar of AOA knew the meaning of this term; that Baker had advised Folmar of Herrera's offer to purchase "trip insurance"; and that President Folmar of AOA accepted such offer on behalf of Export Insurance Company. It was undisputed that the fire loss was in the amount of $15,500.00, being the face amount of the policy ($16,200.00 less salvage $700.00).

Appellants' points 21 through 26 and 29 through 31 are to the effect that there was no evidence or in the alternative insufficient evidence that the minds of the parties ever reached a common understanding on the essential elements of the contract of insurance and that the trial court erred in overruling appellants' motion for instructed verdict and for refusing to grant a new trial on these grounds.

There is voluminous testimony in the record in addition to that which we have set forth in this opinion concerning the coverage afforded Herrera on his Agcat aircraft. It is undisputed that Herrera specified insurance coverage for the trip from Guatemala to San Benito and that trip insurance was ordered from AOA by Baker. Even Export's policy prepared by AOA specified the trip from Guatemala to San Benito, Texas. President Folmar gave no logical explanation of why this was included in the endorsement if the parties had agreed to only a 24-hour coverage. There was other testimony to the effect that the computation of the $90.00 premium paid by Herrera which according to Folmar was for a 24-hour period, was the same premium, according to other experts, as applying to this ferry flight "trip insurance" coverage from Guatemala to San Benito.

Oral contracts to effect insurance are valid and enforceable in this state. An oral agreement to insure against fire can be presumed to be made in contemplation of a policy containing the terms and conditions in customary use and from surrounding circumstances, provided that the oral contract contains all of the necessary elements to effect the issuance of the policy of insurance and that nothing is left open for future negotiations with reference to: 1) the subject matter, 2) the parties, 3) rate of premium, 4) amount, or 5) duration of risk. Springfield Fire & Marine Ins. Co. v. Hubbs-Johnson Motor Co., Tex.Com. App., 42 S.W.2d 248; Pacific Fire Insurance Co. v. Donald, 148 Tex. 277, 224 S.W. 2d 204. See also, Connecticut Fire In-

surance Co. v. Fields, Tex.Civ.App., 236 S.W. 790 and Employers Casualty Co. v. Winslow, Tex.Civ.App., 356 S.W.2d 160, ref. n. r. e.

■ Almost all of the necessary elements concerning the oral contract between the parties was either undisputed, stipulated or agreed to. The subject matter of the oral insurance contract was, (1) the Agcat airplane; the parties, (2) Herrera and Export Insurance Company; the amount of the premium, (3) $90.00 and it was paid; the amount of the risk, (4) $18,000.00 with 10% deductible; and lastly, the duration of the risk, (5) "trip insurance." The only disputed element to make up the binding contract of insurance was resolved by the jury. The jury upon sufficient evidence found that "trip insurance" had a usual and customary meaning in the aviation insurance industry which spelled out the duration of the risk. We hold that there is sufficient evidence to support the jury's findings that Folmar knew and understood that Herrera wanted insurance coverage for the trip from Guatemala to San Benito, and that the defendants accepted Herrera's offer and were paid the premium for such coverage. These points urged are overruled.

The jury further found that the written policy of insurance was prepared by AOA after it had been notified of the aircraft loss; that the written policy did not conform to the oral understanding as to the duration of the risk; that the preparation of the written policy so as not to conform with the oral agreement, was willful; that such written policy was prepared with the intent to deny Herrera's claim; that Herrera was entitled to exemplary damages; and in the amount of $7500.00. Appellants' points 1 through 20 are briefed and argued together and present the contention that there is no evidence and insufficient evidence to support these jury findings and that as a matter of law exemplary damages cannot be assessed against AOA.

The argument of the appellant AOA is to the effect that there is no evidence to support the findings of the jury on exemplary damages, or that regardless of whether or not there was such evidence, AOA cannot be liable for exemplary damages as a matter of law for the acts of its agents, servants or employees; or in any event the acts relied upon by Herrera in support of exemplary damages were not done or performed by an officer or director of AOA, nor is there any evidence that such acts if any were ratified or otherwise condoned by AOA. Appellant AOA cites as Texas authority King v. McGuff, 149 Tex. 432, 234 S.W.2d 403 (1950) and Lane v. Security Title & Trust Co., 382 S.W.2d 326 (1964, ref. n. r. e.). These cases do not support appellants' argument under our facts here.

The written policy which was received on the 18th of January following the loss of January 15 contained this endorsement concerning the Agcat aircraft:

"In consideration of fully earned additional premium [1] of $90.00 (included) it is hereby understood and agreed that in respect to aircraft No. 1, TGDUG–F, coverage is afforded *only from 12:01 a. m. January 10, 1966, to 12:01 a. m. January 11, 1966,* in order to permit the aircraft to be flown from Guatemala to San Benito, Texas." (Emphasis supplied).

Witnesses testified that if you took the above endorsement and left out that portion which is underlined, you would have essentially the type of endorsement that is usually prepared for "trip insurance".

The appellant attacks the sufficiency of the evidence that the written policy was prepared after notice of the loss so as not to conform with the oral agreement. The evidence is virtually undisputed that AOA did not mail the written policy until after it received notice of the loss. The notes that

1. This $90.00 "additional premium" was in addition to the premium charged on the Comanche airplane, aircraft number two.

President Folmar made during the original telephone conversation ordering the "trip insurance", were introduced into evidence. There was no notation on them setting forth the duration of the risk or limiting the policy to a 24-hour period, even though such a short limitation in this type of insurance policy was most unusual and would be an exception to the normal connotation of "trip insurance". We think this would have deserved special note. The order for trip insurance was received and prepared by AOA on January 6; the telegram specifying "trip insurance" was received by Folmar on January 7; the loss occurred on January 15; and the policy was dated on January 14. According to Folmar's secretary she admitted that the policy was prepared by her on the 15th or 16th but she explained that it was backdated to the 14th because she did not want other agents to know that they worked and were in their offices on Saturdays and Sundays. Folmar's secretary had no explanation, however, as to why the policy was not mailed the day it was prepared instead of after they received official notice of the loss on January 17. The policy was received on January 18. It is undisputed that the insuring agreement was made with President Folmar of AOA, and the 24-hour limitation was dictated into the policy by him to his secretary.

■ The jury found that such 24-hour limitation did not conform to the oral contract between Baker and Folmar. This gave rise to a separate tort. The jury's finding, supported we believe by sufficient evidence, that President Folmar willfully prepared the written policy after notice of the loss, so as not to conform with the oral agreement, justified the jury's action in awarding exemplary damages. There was a definite monetary consideration to the appellant insurance company in the premium it received. The fraudulent conduct found by the jury was made further actionable by the continuous contentions of the appellants that the 24-hour limitation correctly reflected the original agreement

of insurance and that its denial of appellee's right to recover under the policy was based on such limitation rather than by any misunderstanding or mutual mistake. Circumstantial evidence may be resorted to to prove ultimate facts. Lynch v. Ricketts, 158 Tex. 487, 314 S.W.2d 273; Republic National Life Ins. Co. v. Bullard, Tex.Civ. App., 399 S.W.2d 376, ref. n. r. e.

Whether or not there has been any willfulness on the part of the appellants, such element of willfulness and intent may be inferred by the acts and conduct of the wrongdoer in order to sustain exemplary damages. Here, the jury, considering the evidence and viewing the supporting circumstances, so found. Tennessee Gas Transmission v. Moorehead, Tex.Civ.App., 405 S.W.2d 81, ref. n. r. e. The plaintiff by virtue of his contract of insurance was entitled to his damages for the loss of his plane. In addition to this, the plaintiff proved elements of inconvenience and expense, including attorney fees. The jury was at liberty to consider this in support of its monetary findings. A. B. Lewis Co. v. Jackson, Tex.Civ.App., 199 S.W.2d 853, wr. ref., n. r. e.; Allison v. Simmons, 306 S.W.2d 206, wr. ref., n. r. e.

■ Where there has been a breach of an express contract, exemplary damages may be recovered when the wrong complained of constitutes both a breach of contract and a tort accompanied by fraud, malice or oppression. Briggs v. Rodriguez, Tex.Civ.App., 236 S.W.2d 510. An element of fraud is the wilfulness or malice accompanied by actual injury. 17 Tex.Jur.2d § 185. We hold that the jury was warranted in finding that AOA prepared the written policy after receiving notice of the loss and that the written policy was not prepared to conform to the oral agreement between Herrera and Baker and between Baker and Folmar; that such preparation of the insurance policy by AOA so as not to conform with the oral contract was willful with the fraudulent intent to deny Herrera's claim, thereby entitling Herrera to actual as well as exemplary damages. In-

ternational Printing Pressmen and Assistants' Union of North America v. Smith, 145 Tex. 399, 198 S.W.2d 729 (1946). See McDonough v. Zamora, Tex.Civ.App., 338 S.W.2d 507, wr. ref., n. r. e.; Delhi Pipeline Corp. v. Lewis, Inc., 408 S.W.2d 295 (Tex.Civ.App., Corpus Christi 1966); Oklahoma Fire Ins. Co. v. Ross, 170 S.W. 1062; Chronister Lumber Company v. Williams, 116 Tex. 207, 288 S.W. 402. Appellants' points 1 through 20 and 27 and 28 are overruled.

■ The jury found that Herrera was deprived of the use of his airplane to his further damage in the amount of $3,000.00. The trial court disregarded these jury findings which are the basis of appellee's cross-points 4 and 5. Although appellee points to evidence in the record concerning damages occasioned by the loss of the use of the airplane in question, the jury found that the airplane was a total loss. The rule is that if a chattel is partially destroyed and can be repaired, the owner can recover, not only the cost of replacement, but also the reasonable value of the loss of the use of the chattel while it is being repaired; however, where the chattel is totally destroyed, no additional recovery may be had for loss of use while the chattel is being replaced. Cogbill v. Martin, Tex.Civ.App., 308 S.W.2d 269 (1957); King v. McGuff, 149 Tex. 432, 234 S.W.2d 403. See also Pasadena State Bank v. Isaac, 149 Tex. 47, 228 S.W.2d 127 and The Kansas City Southern Railway Co. v. Frederick, 276 S.W.2d 332 (Tex.Civ.App.—Beaumont 1955, wr. ref., n. r. e.). These cross-points are overruled.

The jury in answer to the special issues as to exemplary damages included Export as well as AOA. On appellant's motion, the court disregarded the jury findings on exemplary damages as to Export. This is the basis of appellee's cross-points 1 through 3. An examination of the appellants' motion for instructed verdict, objections to the court's charge and the amended motion to disregard certain jury findings on special issues reveals that appellants' contentions were that the tortuous act if done at all by AOA was done by a mere employee (Folmar's secretary) for which neither AOA nor Export could be held liable in exemplary damages. The trial court's motion disregarded these findings as to Export. However, a review of the evidence, the pleadings and the law, convinces us that the trial court was in error in setting aside these issues as to Export.

■ President Folmar of AOA, represented AOA and Export. He testified that AOA was the general writing agent for Export in Texas for aviation insurance. In appellants' cross-action they plead that they (Export and AOA) "expressly approved" the coverages contained in the written insurance policy. Export further specifically pleaded the agency contract between Export acting between AOA and Baker. The Supreme Court in King v. McGuff, supra, set forth tests which are sufficient to hold Export liable for exemplary damages jointly and severally with its manager and general writing agent, AOA. We hold that the facts and pleadings of appellants show that Export authorized the preparation of the written insurance policy in the manner in which it was prepared by AOA; that Export ratified and approved such preparation of the written policy; that AOA was employed by Export in a managerial capacity; and that the preparation of the policy by Folmar using his discretion as to coverage and form, was within the scope of his employment as President of AOA. We therefore hold that Export was also liable for exemplary damages for the act of its agent AOA, and that the trial court erred in disregarding such jury findings as to Export. Appellee's cross-points 1, 2 and 3 are sustained. The judgment of the trial court is accordingly reformed.

Judgment of the trial court is affirmed in part and reversed and rendered in part.