**Ken J. EDWARDS, Plaintiff-Appellant,**

v.

**ALLIED CHEMICAL CORPORATION
et al., Defendants-Appellees.**

**No. 26649.**

United States Court of Appeals
Fifth Circuit.

July 16, 1969.

Rehearing Denied Oct. 6, 1969.

Craig C. Cantey, Jr., Houston, Tex., for appellant Ken J. Edwards; Foreman, Dyess, Prewett, Henderson & Cantey, Houston, Tex., of counsel.

M. W. Parse, Jr., Gay C. Brinson, Jr., Paul E. Stallings, Dan G. Matthews, Houston, Tex., for appellees; Vinson, Elkins, Weems & Searls, Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., of counsel.

Before WISDOM and DYER, Circuit Judges, and KRENTZMAN, District Judge.

WISDOM, Circuit Judge:

The factual setting of this diversity case is exotic, the legal issue humdrum. The parties' maneuverings to gain oil concessions on the Arabian Peninsula have generated a dispute over the interpretation of a straight-forward contract. The district court held that the wording of the contract does not support the plaintiff's interpretation. We agree and affirm.

## I.

Ken J. Edwards, the plaintiff, wrote to the defendants, Pure Oil and United Texas Natural Gas, on October 6, 1961, offering to negotiate for oil concessions on their behalf with King Saud's government in Saudi Arabia. The letter apparently incorporated oral arrangements made earlier the same day. The terms, basically, were that Edwards would try to obtain a concession in a "Preferential Area" in Saudi Arabia for the companies under specified royalty terms. The companies would jointly agree to pay Edwards $100 a day plus $20 a day in expenses while he was negotiating, for a maximum period of a year. They would also pay his travel and "the cost of presents for distribution in Saudi Arabia up to $1000". The companies could terminate the contract upon written notice at any time after thirty days. Additionally, the companies would pay Edwards half a cent a barrel on the concession up to $500,000, provided that he obtain the particular sort of "Preferential Area" concession described in the letter. Thus the letter provided two types of compensation: 1) fixed per diem payments and 2) contingent fees depending upon Edwards' negotiating success. Representatives of the companies accepted Edwards' offer by signing the letter and returning it.

The President of Union Texas, J. Howard Marshall, wrote to Edwards in Riyadh, Saudi Arabia, on July 23, 1962. He noted the lack of "tangible evidence of likely results" at that point, and said that he was "holding up the balance of the per diem until we know something more definite about where we are going". After that the companies continued to pay only Edwards' expense allowance, without the $100 a day for his services. They stopped paying the expense in November 1962. Edwards stayed on in Saudi Arabia at his own expense, however, and continued to report to the companies, apparently with some encouragement from Marshall.[1] He ran into trouble with his hotel bill in May 1965, however, and needed a personal loan from Marshall to avoid suit. By that time, however, the companies had decided that Edwards' continued presence in Riyadh, even at his own expense, would only embarrass their dealings with the Saudi government. Edwards met with Marshall and another official at the Jeddah Palace Hotel on April 22, 1965. Marshall and E. David Philley, who represented Pure Oil, wrote to him on June 21, 1965, urging him to leave the country. That letter, based on the Jeddah discussions, embodied the contract that is in dispute here. It reads as follows:

Dear Ken:

We were very disappointed to learn that after we went so far as to lend you funds necessary to clear up your hotel indebtedness you still have not left Saudi Arabia.

As you know, we had no legal or moral obligation to extricate you from the situation in which you have placed yourself, but upon being told about your problem, we reluctantly arranged for the loan required to clear yourself of your indebtedness so that you might honorably leave the country. Now, we find you probably are getting yourself back into the same predicament from which you have been recently extricated.

As we explained to you in Jeddah, and on many other occasions, you have, in our opinion, rendered all the service you can in connection with our efforts to obtain a concession, and we feel you should not stay in Saudi Arabia. In any event, we have no choice but to inform you that we are in no way responsible for any of your costs or expenses or problems that may arise, and if you insist on staying in Saudi Arabia, we have no obligations to you of any nature.

[1]. Marshall wrote Edwards on February 4, 1964, saying, "Keep up the good work and let us know how you progress." On March 17, 1964, he again wrote: "Keep up the good work and let us know how your progress develops."

In view of the wide difference in the nature of the concession which now seems possible from that you originally represented to be possible, we have no legal obligation to pay you any fees arising out of the type of concession which may now be secured. Nevertheless, we did inform you that we were honoring the terms of our original agreement with you as a matter of moral obligation. However, if you persist in remaining in Arabia, we very much believe this is likely to jeopardize our chances of securing any concession at all.

Accordingly, unless you arrange to return home promptly—say, at most, within a week, we shall reluctantly be compelled to withdraw even our moral commitment to pay you the fees which we had originally agreed upon for the successful awarding of a different and more desirable concession than that which now seems possible.

> Yours very truly,
> /s/ E. David Philley
> E. David Philley
> /s/ J. Howard Marshall
> J. Howard Marshall

Edwards left the country on July 1, 1965. According to his affidavit, his departure forced him to drop negotiations on behalf of other American interests. The defendant companies failed to obtain the concessions. Edwards later demanded that the companies pay him at the agreed rate of $120 per day for his time in Saudi Arabia. They refused. He filed this suit on June 9, 1967. On cross motions for summary judgment supported by affidavits, the district court ordered entry of judgment for the defendants.

## II.

Edwards does not seek recovery on the original contract of October 6, 1961. That contract ended either with Marshall's letter of July 23, 1962, or, if the letter was not the required written notice, on October 31, 1962, the date of automatic termination. Any claim that Edwards had under the 1961 contract would be barred by the Texas statute of limitations.[2]

Instead, Edwards sues on the letter of June 21, 1965. He interprets it as an offer by the companies to enter into a unilateral contract: they would pay Edwards under the original 1961 contract if he would leave Saudi Arabia within a week. His compliance, says Edwards, effectively bound the companies as "acceptance" under the theory of unilateral contracts. Edwards would read the 1965 contract as a revival of the companies' obligations under the 1961 contract, with the exception that the maximum period of effectiveness was no longer limited to a year. The companies, he argues, committed themselves to pay his full $120 per diem plus travel, plus one-half cent a barrel on future concessions if he would only get out of Saudi Arabia. Edwards admits that the companies owe him nothing on the contingent royalty, since they never gained any concession. He insists, however, that he revived the binding duty to pay him at least the remainder of a full year's per diems, or $13,100, when he left the country. (Since the companies in his view never legally terminated the 1961 contract, they would owe him that much anyway but for the statute of limitations.) Beyond that, he contends that the 1965 letter actually expanded the companies' liability by offering to pay his per diem not just to October 1962, but to July 1965, when he finally left the country.

As an alternative to his unilateral contract theory Edwards suggests that the letter entitles him to recovery under principles of promissory estoppel. The companies, he says, promised to pay him the described amounts if he would leave the country. He relied to his detriment on the promise, making it enforceable under Texas law.

---

**2.** The statutory period for a debt arising from a written contract is four years. Tex.Rev. Civ.Stat.Ann. art. 5527 (1958).

We do not disagree with either of Edwards' legal theories. If the contract meant what he says it did, then he would be entitled to recovery for his acceptance by performance under the unilateral contract theory, Edwards v. Roberts, 209 S.W. 247 (Tex.Civ.App. Austin 1919, reh. den.); United Appliance Corporation v. Boyd, 108 S.W.2d 760 (Tex. Civ.App. Ft. Worth 1947, no writ hist.), or for his detrimental reliance under the estoppel theory.

Like the district court, however, we balk at Edwards' reading of the companies' June 21, 1965, letter. Texas law requires us to view the contract as a whole and "to consider each part with every other part so that the effect and meaning of one part on any other part may be determined." Steeger v. Beard Drilling Inc., 371 S.W.2d 684 (Tex.Sup. Ct.1963). He relies upon the last sentence of the letter's fourth paragraph: "Nevertheless, we did inform you that we were honoring the terms of our original agreement with you as a matter of moral obligation." That sentence, read alone, does seem to refer to all the terms of the previous contract. Inspection of the last sentence of the paragraph before it, however, changes the picture: "In any event, we have no choice but to inform you that we are in no way responsible for any of your costs, or expenses, or problems, that arise and if you insist on staying in Saudi Arabia, we have no obligation to you of any nature." That sentence distinguishes between per diem "costs or expenses" and the other "obligations" under the 1961 contract, that is, the fee per barrel. It flatly disclaims liability for the per diem, but leaves the door open on the royalties if Edwards makes good his rapid departure.

The following sentence explicitly confirms the distinction. It focuses squarely on the royalty payments: "In view of the wide difference in the nature of the concession which now seems possible from what you originally represented to be possible, we have no legal obligation to pay you any fees *arising out of the type of concession which may now be se-* *cured."* The words speak for themselves. The authors of the letter have turned their attention from payment of the per diem amounts foreclosed by the previous sentence, and refer solely to production royalties. They disclaim purely legal liability for such royalties, since the "Preferential Area" concessions stipulated in the 1961 agreement can no longer be had. Then, and only then, does the letter go on to mention the "terms of the original agreement" in the sentence relied on by Edwards. It declares a willingness to revive these terms as a matter of moral obligation. From what has preceded, however, the terms referred to are clearly the royalty terms and not the per diem terms for expenses and services.

Any doubt on that score disappears in the next sentence, which contains the operative words of commitment: "Accordingly, unless you arrange to return home promptly——say at most within a week, we shall reluctantly be compelled to withdraw even our moral commitment *to pay you the fees which we had originally agreed upon for the successful awarding of a different and more desirable concession than that which now seems possible."* The later "acceptance" or "reliance" by Edwards in leaving Saudi Arabia bound the companies only to that commitment, the commitment to pay royalties on any concessions they could get from the Saudi government. The contract, binding though it was, turned out to be useless from Edwards' standpoint, since no concessions were forthcoming.

We do not need to pass upon Edwards' further argument that the revised 1961 per diem obligation entitled him to be paid through April 1965, or that the companies never even paid him the amounts due for his services before the ambiguous letter of termination in July 1962. As we have said, these obligations became unenforceable under the 1961 contract with the running of the statute of limitations. Any obligations must rest solely on the theory of revival under the 1965 letter. That letter, how-

ever, breathed legal life only into the companies' commitment to pay royalties and not, to repeat, into the fixed-sum commitments of the original agreement.

■ We conclude, therefore, that any contract formed under the June 1965 letter by Edwards' "acceptance" or "detrimental reliance" cannot support the recovery sought here.

### III.

Edwards' second theory of recovery, founded on fraud, fares no better than his first. He alleges that the defendant companies wilfully misled him by their oral representation of April 22, later embodied in the letter of June 21, that if he left the country, they would pay him according to the terms of the original contract a sum of roughly $1,000. Edwards claims to have relied on this representation to his detriment, alleging as damages his travel expenses, the loss of business opportunities in Arabia, and lost "continuity contact" with Saudi officials. Edwards' affidavit says that Marshall and another company official offered him payment under the original agreement, but it does not allege that the offer was conditioned upon his departure from Arabia. Nor does it allege that he left in reliance on representation that payment would follow his departure. In fact, such an allegation would be difficult to maintain because the letter of June 21 intervened before he left. As we have suggested in Part II, that letter made the companies' position clear: they would only pay his concession royalties. If the representation of April allowed Edwards reasonably to think that he could recoup his per diem expenses and fees dating from 1962 merely by quitting the country, and if there was an intent to deceive, then the later letter should have disabused him of that idea. He could not reasonably have mistaken the intent of the April 22 promises, if promises there were, after reading the letter of June 21.

■■ Texas allows recovery for fraud only where the defrauded party "had a right to rely" on the misrepresentation. Bell v. Henson, Ct. of Civil Appeals 1934, 74 S.W.2d 455 (err. dism'd). Under the undisputed facts of this case, Edwards had no such right.

The decision of the district court is Affirmed.