FREDONIA BROADCASTING CORPORATION, INC., Plaintiff-Appellee,

v.

RCA CORPORATION, Defendant-Appellant.

No. 72-2341.

United States Court of Appeals, Fifth Circuit.

July 2, 1973.

Rehearing Denied Nov. 2, 1973.

10. Ryan Stevedor. Co. v. Pan-Atlantic Steam. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956).

James E. Coleman, Jr., Marvin S. Sloman, Earl F. Hale, Jr., Dallas, Tex., for defendant-appellant.

John Gano, Houston, Tex., Ben Johnson, Dallas, Tex., for plaintiff-appellee.

Before WISDOM, GEWIN and COLEMAN, Circuit Judges.

COLEMAN, Circuit Judge:

RCA contracted to sell UHF color television broadcasting equipment to Fredonia Broadcasting Corporation for the operation of television station, KAEC-TV, in Lufkin, Texas. The station was designated as Channel 19 and was to cover the Lufkin and Nacogdoches area. Fredonia's operation failed. The station began broadcasting on July 30, 1969, and ceased operation on March 18, 1970.

Fredonia sued[1] RCA for fraud, for breach of the sales contract, and for breach of warranty. Fredonia sought actual and punitive damages in the total amount of $2,650,000. RCA counterclaimed for $605,493.80 for the value of the broadcasting equipment delivered.

The District Court submitted the case to the jury under Rule 49(a), Fed.R. Civ.P.[2] The jury was asked to answer

---

1. RCA properly removed the case to the United States District Court for the Eastern District of Texas under 28 U.S.C. § 1441.

2. Rule 49, Fed.R.Civ.P., states as follows:

   (a) Special Verdicts. The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate. The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.

   (b) General Verdict Accompanied by Answer to Interrogatories. The court may submit to the jury, together with appropriate forms for a general verdict, written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict. The court shall give such explanation or instruc-

18 fact questions and two damages questions. The jury found in favor of Fredonia and awarded $850,000 for actual damages and $150,000 for exemplary damages.

On appeal, RCA raises numerous issues concerning the findings as to both liability and damages.

We reverse and remand for a new trial on both issues.

## THE FACTS

On January 15, 1969, RCA and several other suppliers of broadcast equipment made presentations to a committee of Fredonia's Board of Directors, composed of Dr. Basil Atkinson, chairman of the Board; Al Cudlipp, president; and Edward McFarland, attorney for Fredonia. William Carr, a consulting engineer for Fredonia, was also present. RCA's written proposal, titled Broadcast Equipment Proposal, was explained by its field salesman, George McClanathan, and by its area sales manager, Dana Pratt. At this meeting Fredonia did not make any final decision as to which supplier to choose, but decided to ask for another meeting with RCA.

Cudlipp called McClanathan and asked him to come to Lufkin for a final negotiation session. This meeting was held on February 6, 1969. Atkinson, Cud-

lipp, and McFarland were present on behalf of Fredonia.

At these meetings Fredonia claims that RCA made several oral representations which induced it to enter into a contract with RCA.

Fredonia claims that RCA represented (1) it would deliver the equipment in time for Fredonia to meet the on-the-air date of June 1, 1969; (2) it would supervise the installation; and (3) it would deliver used and new equipment which would run and operate properly and would be suitable for the purposes for which it was intended. McFarland, Fredonia's attorney, testified that he relied on these representations in advising his client to enter into a contract with RCA. Cudlipp also testified that he relied on these representations.

These oral representations conflict with RCA's written broadcast proposal since that written proposal states: (1) RCA would not be liable in damages for delays in delivery and the buyer could cancel if delivery was not made within the date specified, (2) RCA would not assume responsibility for the installation and operation of equipment if the buyer requested RCA to furnish a representative to supervise the installation, and (3) RCA's warranty for the equipment would not include liability for damages of any kind connected with the use of

---

tion as may be necessary to enable the jury both to make answers to the interrogatories and to render a general verdict, and the court shall direct the jury both to make written answers and to render a general verdict. When the general verdict and the answers are harmonious, the appropriate judgment upon the verdict and answers shall be entered pursuant to Rule 58. When the answers are consistent with each other but one or more is inconsistent with the general verdict, judgment may be entered pursuant to Rule 58 in accordance with the answers, notwithstanding the general verdict, or the court may return the jury for further consideration of its answers and verdict or may order a new trial. When the answers are inconsistent with each other and one or more is likewise inconsistent with the

general verdict, judgment shall not be entered, but the court shall return the jury for further consideration of its answers and verdict or shall order a new trial.

This case is under Rule 49(a) and not 49(b). The District Court erroneously called the "questions" under Rule 49(a) "interrogatories". In this opinion we shall use the term "question". All the "questions" asked the jury by the District Court are set out fully in Appendix A. The term "interrogatory" is used in Appendix A to avoid confusion when there are cross-references. Throughout the remainder of this opinion all "questions" will not be footnoted and the reader is directed to refer to Appendix A.

Furthermore, in this case, no general verdict was requested of the jury or entered by it.

the equipment or its failure to function properly. RCA's written broadcast proposal also states that:

[the] proposal including any modifications or additions agreed to in writing by the parties prior to acceptance by RCA expresses the entire understanding of the parties . . . and no agreement modifying or supplementing the terms of this proposal shall be valid unless in writing duly signed by the parties.

The evidence is conflicting as to whether RCA made misrepresentations as to the date of delivery, degree of supervision, and quality of the equipment and as to whether Fredonia relied on these representations. Both Cudlipp and McFarland testified that McClanathan promised on February 6, 1969, that delivery could be arranged so that Fredonia could meet its air date of June 1, 1969. McClanathan and Pratt both knew that Fredonia was attempting to meet an air date of June 1, 1969. An internal memorandum of RCA, titled Contract Data Sheet, which informed RCA's internal organization of the expected air date, stated that the air date for the new station was estimated to be May 15, 1969. This document also stated that the required delivery date for studio equipment was April 1, 1969, and the required delivery date for the transmitter and the antenna was May 1, 1969.

Other evidence was to the contrary and showed that Fredonia did not expect to be on the air by June 1, 1969. William Carr, Fredonia's consulting engineer, testified for the defendant that he advised his client that July 1, 1969, was a reasonable air date. Carr also testified that Fredonia was delayed because Fredonia did not supply enough personnel to work at installing the equipment. The building to house the station's equipment was not completely finished on May 9, 1969. A letter from Fredonia's Washington attorneys to the FCC states that the anticipated air date was July 1, 1969. McClanathan's representations as to a delivery date can also be interpreted to mean that RCA would ship the equipment within 120 days of Fredonia's acceptance on February 6, 1969, and not that Fredonia would be on the air 120 days from February 6, 1969.

Finally, the evidence shows that permission to construct microwave towers, which were essential for the broadcasting of network programs, was not received until June 5, 1969.

There was evidence that RCA represented through its agents that it would supervise installation of the equipment, but there was also other evidence which showed that Fredonia intended to rely on Carr to supervise the installation. Carr testified that under the terms of his consulting contract he was to be responsible for the installation of the equipment. Correspondence between Carr and Cudlipp corroborates Carr's responsibility. Cudlipp also testified that RCA's Barbour did a lot of work Cudlipp expected Carr to do. Cudlipp also testified that he felt Carr was not at the station as often as he should have been.

While there was evidence to show that RCA represented to deliver operable and suitable equipment and did not do so, there was also evidence to show that Fredonia, itself, might have been at fault in causing the equipment not to operate. Barbour, an RCA employee, testified that when he arrived at the station on June 4, 1969, he found that there were errors made in the installation of the equipment. Barbour also testified that Fredonia experienced problems that were normally to be expected in the starting up of a television station. Other evidence showed that Cudlipp wrote a letter stating that he had a good operating crew, but that they were not very good in the maintenance of the equipment. RCA also introduced testimony that showed it had given Fredonia credit for two inoperable cameras that RCA had delivered. Finally, after RCA's Parker had conducted a proof of performance on the transmitter, Cudlipp wrote Barbour that for Fredonia he accepted the proof of performance. This evidence tended to show that RCA delivered operable equipment and that any

breakdowns in broadcast transmission was the fault of Fredonia.

The parties disagree as to when a binding contract was made between the parties and disagree as to which documents constituted the contract.

At the February 6, 1969 meeting Fredonia was not satisfied with the exact written terms of RCA's written broadcast proposal and requested three changes. McClanathan, RCA's salesman, said that while he did not have the authority to bind RCA to any revision, he could put Fredonia in touch by telephone with Edwin Tracy, RCA's Division Vice-President of Broadcast Sales, who had authority to accept and approve changes. The three changes Fredonia requested concerned (1) additions and deletions to the proposal, (2) freight charges, and (3) method of down-payment. Tracy agreed to these changes for RCA. RCA contends that these three changes were the only ones made to the written agreement.

McFarland at this meeting [according to his testimony] was concerned that RCA's broadcast proposal did not bind RCA. McFarland, therefore, prepared a letter of acceptance, dated February 6, 1969, which stated that Fredonia accepted RCA's broadcast proposal at a package price of $471,967.00. Fredonia claims that the letter together with the broadcast proposal constitute the contract between the parties. This acceptance letter enumerated the three changes that Fredonia wanted RCA to make in the broadcast proposal.

The letter also stated specifically that a down-payment of 25% of the total price would be made. This 25% down-payment was to be paid in part as follows: (1) $25,000 paid immediately, (2) $50,000 paid on notification the transmitter was ready, and (3) the remainder paid thirty days thereafter. Fredonia sent to RCA's office at Camden, New Jersey, the $25,000 on February 6, 1969. RCA accepted the check and deposited it to its bank account. The February 6, 1969 acceptance letter also detailed the arrangement for the payment of notes to cover the balance of the amount due.

McFarland testified that it was agreed with Tracy that this acceptance letter consummated a contract between RCA and Fredonia. Tracy testified that an acceptance was not given since it was RCA's procedure that a contract would be made only when approved by RCA at its home office in Camden, New Jersey. Fredonia's reliance on the acceptance letter to form a binding contract conflicts with the procedure specified in RCA's broadcast proposal which states that the broadcast proposal "shall not be binding upon RCA until accepted by it in writing at Camden, New Jersey" and that "use [receipt] of a downpayment shall not constitute an acceptance". McFarland testified that he relied on Tracy's representation that a binding contract had been made.

McFarland admitted that he knew that RCA would require the signing of a conditional sales contract which would incorporate a security agreement. McFarland also testified that he felt that such an arrangement was provided for in the February 6, 1969, acceptance letter since that letter details an arrangement for the payment of notes. The broadcast proposal also anticipates that a conditional sales agreement will be entered into since it states that if the buyer desires deferred payment terms the buyer "agrees to arrange for RCA's standard form of deferred payment contract and related instruments to be signed prior to any shipment".

Cudlipp received the conditional sales agreement on April 14, 1969, and executed the agreement on April 20, 1969. RCA approved the Conditional Sales Agreement on April 28, 1969. RCA contends that only then was a final binding contract concluded between the parties. The terms of Conditional Sales Agreement are exactly the same as the January 15, 1969, broadcast proposal except that the later conditional sales agreement gives RCA a security interest in the equipment.

Fredonia contends that it was coerced into signing the conditional sales agreement because RCA would not ship any equipment until such an agreement was signed. The evidence shows that RCA withheld delivery of the equipment until the conditional sales agreement was signed by Fredonia. An RCA interoffice memo verifies that no shipment was to be made until the conditional sales agreement was signed. No equipment was delivered until after the date Fredonia signed the conditional sales agreement. The first shipment of equipment was received at the end of April, 1969, and was not enough to get Fredonia on the air. It was only in the beginning of July, 1969, that enough equipment was received to put the station on the air.

Fredonia asserts that the delay in the shipment of the equipment caused Fredonia to miss its scheduled air date and thereby damaged Fredonia by the loss of advertising revenues.

Fredonia introduced into evidence also instances where RCA delivered defective equipment. Fredonia intended to show by such evidence that such inoperable equipment caused the station to broadcase on an intermittent basis and thereby to lose advertising revenues.

The evidence showed that RCA did deliver three different cameras which were inoperable. RCA sent Fredonia a TK-42 camera, costing $27,000, which John Barbour, an employee of RCA's project management department, testified was inoperable. The testimony of John Cassidy, RCA's Manager of Project Management and Administrative Services, corroborates Barbour's account. RCA also sent Fredonia a TK-26 camera which Barbour admitted had been subject to cannibalization. An RCA internal memorandum showed that this camera was intended to be scrapped by RCA and not sold. A second internal RCA memorandum shows that RCA considered the TK-26 camera not fit for resale or refurbishing after Fredonia returned the camera to RCA. A TP-6 projector RCA sold Fredonia was also intended to be scrapped as shown by an RCA inter-

nal memorandum. RCA contends that the TK-26 camera and the TP-6 projector were repaired before the station went on the air and did not cause a delay.

Fredonia introduced other evidence to show that RCA delivered defective equipment. Barbour testified that a Klystron tube in the transmitter which was furnished by RCA operated at reduced power. A Klystron tube is a power source and produces a great increase in power sufficient to cause the antenna system to radiate. Reduction in power of the Klystron tube causes the area receiving the station's signal to be reduced. Barbour further testified that the de-icer on top of the television tower did not work properly. A malfunctioning de-icer requires the station to reduce its power because otherwise other equipment might be damaged. De-icers are used so that the station can always operate at maximum power. RCA also furnished a u-bend connector on the transmitter that did not work and required replacement. Lee Roy Franklin, an engineer for Fredonia, testified that the station could not broadcast on its second day of operation because of a shorted capacitor on the blower motor inside the transmitter. Franklin and another Fredonia engineer, James Kirkland, enumerated other instances when broadcast equipment broke down.

Cudlipp and McFarland repeatedly testified that the delay of the initial broadcast date and interruptions in broadcast service damaged the station because advertising revenues were lost. Employees of RCA who made representations as to dates RCA would deliver equipment and as to the quality of the equipment knew that delay as to the initial broadcast date and intermittent broadcast operation would cause Fredonia to be damaged. Fredonia never introduced into evidence data showing exactly on what dates broadcasting service was interrupted so that advertising revenue was lost. Fredonia also never introduced any financial analysis to concretely detail advertising revenue that it

allegedly lost. However, Norman Fischer, a broadcasting consultant, did testify as an expert witness for Fredonia. Over RCA's objection, Fischer gave his opinion as to value of the station at various points in time as follows: (1) value of the station just before it went off the air taking in account its future potential —$2,420,000; (2) value of the station just before it went off the air without taking into account its future potential —$850,000; (3) value of the station just after it went off the air—$525,000; and (4) value of the station just after it went off the air minus its CBS affiliation—$450,000.

## THE LAW

### I.  *Breach of Contract*

■ In its amended complaint Fredonia asserted three different theories [3] of relief: fraud, breach of contract, and breach of warranty. Of course, under Rule 8(e), Fed.R.Civ.P., Fredonia may state as many claims as it has, regardless of their consistency. See Wright & Miller, Federal Practice and Procedure: Civil § 1283, pp. 373–375; Pulliam v. Gulf Lumber Co., 5 Cir., 1963, 312 F.2d 505, 507; and Breeding v. Massey, 8 Cir., 1967, 378 F.2d 171, 178.

In the answers to the questions submitted to it, the jury found that RCA breached the contract, breached its warranty as to representations about the equipment, and also committed fraud.

■■ In general, a defrauded party has three general remedies as follows:

1. A right to damages for being led into the transaction;

2. Recission of the fraudulent transaction and restoration of the situation which the parties occupied before the fraudulent transaction was entered into; and

3. Enforcement against the fraudulent person of the kind of bargain

he represented that he was making.

Williston on Contracts, Third Edition, § 1523, pp. 606–607. The defrauded party cannot seek both to have the contract rescinded and at the same time sue on the contract for the damages resulting from the fraudulent transaction. Ringsby Truck Lines, Inc. v. Beardsley, 8 Cir., 1964, 331 F.2d 14, 17 and authorities cited therein, International Sec. Life Ins. Co. v. Finck, 475 S.W.2d 363 (Tex. Civ.App.1971), Holley v. Corbell, 443 S. W.2d 63 (Tex.Civ.App.1969), Dallas Farm Machinery Company v. Reaves, 158 Tex. 1, 307 S.W.2d 233, 238–239 (1957).

■ However, at the same time a judgment for fraud and breach of contract can stand, Southwestern Packing Co. v. Cincinnati Butchers' S Company, 5 Cir., 1944, 139 F.2d 201, 203; Bankers Trust Company v. Pacific Employers Insurance Company, 9 Cir., 1960, 282 F. 2d 106, 110; and International Sec. Life Ins. Co. v. Finck, supra 475 S.W.2d at 369. In Bankers Trust Co. v. Pacific Employers Insurance Co., supra, the Court said:

It is the law that one who has been fraudulently induced into a contract may elect to stand by that contract and sue for damages for the fraud. When this happens and the defrauding party also refused to perform the contract as it stands, he commits a second wrong, and a separate and distinct cause of action arises for the breach of contract. The same basic transaction gives rise to distinct and independent causes of action which may be consecutively pursued to satisfaction. "Thus, an action on a contract induced by fraud is not inconsistent with an action for damages for the deceit; * * *." 18 Am.Jur. 139, El. of Rem. § 14 (1st ed. 1938). "A right of action on a contract and

---

3. Fredonia also raised repudiation of the contract in the pre-trial order. The jury found in Question No. 11 that RCA repudiated the contract. The jury's determination of repudiation is discussed *infra.*

for fraud in inducing plaintiff to enter into such contract may exist at the same time, and a recovery on one of the causes will not bar a subsequent action on the other." 50 C.J.S. Judgments § 676, p. 121 (1st ed. 1947). The courts of many states have recognized the rule that a suit on a contract and a suit for fraud in inducing the contract are two different causes of action with separate and consistent remedies. [Footnote omitted.]

*Id.* 282 F.2d at 110. See also Falls Sand and Gravel Co. v. Western Concrete, Inc., 270 F.Supp. 495, 500 (D.Mont. 1967).

In the present case, by the very terms of the contract, Fredonia's breach of contract claims cannot stand; the contract precludes it.

The jury's answers to Questions Nos. 7 and 9 show how the jury viewed the contractual relationship of the parties.

■ The jury found that a contract existed in Question No. 7[4] when it found that the "parties intended" that the defendant's proposal of January 15, 1969, coupled with the plaintiff's February 6, 1969, letter of acceptance, and the oral representation made by the defendant to the plaintiff "constituted the contract between the parties".

■ The jury further found in Question No. 9 that the defendant breached this contract by the following acts:

(a) By deliberately withholding shipment to the plaintiff of the items of equipment contracted for more than 75 days after February 6, 1969, and thereafter until plaintiff completed documents submitted to it by the defendant?

(b) By delivering such equipment contracted for on a delayed, erratic, and incomplete basis?

(c) By delivering equipment that was not of a quality such as is generally sold in the market and suitable for that which it is intended·or for the particular uses to which the goods were to be put?

(d) By withholding personnel necessary to supervise the installation of equipment until after June 1, 1969, and in failing to maintain such supervisory personnel on the site, except on an intermittent and irregular basis?

(e) By failing, after notice, if any, to correct or remedy any such condition, or repair or replace any such equipment?

The jury's answer to Question No. 7 that a contract existed between the parties and its answer to Question No. 9 that RCA breached the contract show that the jury believed Fredonia affirmed the contract it had been induced into by fraud.[5] In affirming the contract, Fredonia is bound by the contract terms as were set out in RCA's January 15, 1969, proposal. In that proposal, as we have already discussed. RCA was absolved from any responsibilty for late delivery,

---

4. The wording of Question No. 7 is unfortunately misleading.
  Question No. 7 states:
    Do you find from a preponderance of the evidence that the parties intended that the defendant's proposal of January 15, 1969, coupled with the plaintiff's letter of acceptance of this proposal, dated February 6, 1969, and oral representations, if any, made to the plaintiff by the defendant, constituted the contract between the parties? Answer "It did" or "It did not".
  Question No. 7 starts out asking the jury what the parties *intended* to be the contract and concludes with the jury find-

ing what *was* the contract. The finding of whether documents constitute a contract is a conclusion of law and not for the jury's fact finding determination. Success Motivation Institute, Inc. v. Jamieson Film Co., 473 S.W.2d 275, 280 (Tex.Civ.App.1971) and cases cited therein.
  We see Question No. 7 as telling what the jury believed the parties *intended* the contract to be and not what the contract was.

5. The jury found RCA committed fraud in Questions No. 1, 2, and 3. These fraud claims are discussed *infra.*

failure to supervise, and defective equipment.[6] Therefore, Fredonia's claims for breach of contract cannot stand.

6. The exact contract terms of the January 15, 1969, proposal limiting RCA's liability are as follows:

5. *Delivery.* (a) RCA will endeavor to meet the estimated delivery dates specified in this agreement (and as may be from time to time revised by mutual agreement) but shall not be liable in damages or otherwise, nor shall you be relieved of performance, because of delays in delivery; provided, however, that, except as may otherwise be stated in this agreement (including any revisions hereof), as to equipment items which have not been shipped to you within four (4) months after the estimated delivery dates applicable to such items, you shall have the right, provided RCA is notified in writing, to cancel any such items from this agreement to the extent that such items shall not have been shipped to you prior to RCA's receipt of the notice of cancellation. In the event of cancellation of any such items the contract price shall be reduced accordingly, except that if unit prices are not set out opposite the equipment items cancelled the reduction in contract price shall be as mutually agreed upon.

8. *Installation.* RCA will furnish you with an instruction book setting forth pertinent information relating to installation and operation of the equipment. RCA will at your request and subject to prior commitments, furnish a representative to supervise the installation of the equipment listed in Schedule A and to instruct your personnel in the adjustment and operation thereof. Unless otherwise provided in this proposal, charges for furnishing such representative shall be at the current per diem rate in effect at the time, plus transportation and reasonable living expenses, and shall be payable upon submission of invoices. Such supervisory service shall not include the furnishing or arranging for the furnishing of any equipment, materials or services required for the actual installation. You will assume complete responsibility for the installation and operation of the equipment including, adequately staffing your organization with technically qualified personnel, furnishing or arranging for the furnishing by others of equipment, materials or services not otherwise provided for in this proposal, and the obtaining of all permits, licenses or certificates required by any regulatory body for the installation or use of the equipment.

9. *Warranty.* RCA warrants the equipment of its manufacture (except used equipment, electron tubes, transistors and television tape recorder handwheel panel assemblies) purchased by you hereunder to be free from defects in workmanship and material for a period of one (1) year after delivery and RCA agrees to make good f. o. b. its factory, all defective parts which are returned to RCA's factory, transportation prepaid, provided that our examination discloses that the defects are due to defective workmanship or material and that the equipment has not been misused, altered, repaired, or improperly installed. Correction of such defects by repair or replacement at RCA's factory and the shipment of the repaired or replaced parts to you f. o. b. RCA's factory, shall constitute the fulfillment of all of RCA's obligations in respect of the equipment furnished hereunder. You agree that except for such repair and replacement, RCA shall in no event be liable for damages of any kind connected with the use of the equipment or its failure to function properly. Used equipment shall bear no warranty unless otherwise specified. Electron tubes, transistors and television tape recorder headwheel panel assemblies shall bear the warranty accompanying them at the time of delivery. Equipment furnished by RCA but manufactured by another shall bear the warranty given by such other manufacturer. No warranties other than those set forth in this paragraph are given or are to be implied with respect to the equipment furnished hereunder.

II. *Other Conditions.* (a) Neither RCA nor you shall be liable for general, special, indirect, or consequential damages in connection with any obligations created by this agreement or arising out of any acts performed in relation to such obligations. Both RCA and you acknowledge that such lack of liability, without limiting the generality of the foregoing, extends to loss of actual or anticipated revenue, loss of air time, and damage to the business reputations of either party to this agreement.

In affirming the contract, Fredonia was bound by all its provisions. Included in the provisions was the agreement to be bound by RCA's deferred payment

The District Court recognized the inconsistency between the breach theory and the terms of the contract. It attempted to reconcile and explain the inconsistency in its post-trial order as follows:

[U]nless there is some theory under which Fredonia can void the entire February 6 transaction, or at least certain of its terms, it seems clear to the court that Fredonia would be precluded from recovery by the "terms and conditions" portion, which specifically defines the relationship between the parties as regards delivery dates, warranties, and supervision of installation. The effect of the jury's finding on the fraud theory is obvious. Less apparent is the effect of the jury's determination that RCA is liable also upon the warranty and breach of contract theories. To uphold the jury's verdict on the theories of breach of warranty and breach of contract, the court must assume that the jury tacitly reformed the contract, on the basis that RCA fraudulently represented that the warranty, delivery, and supervision provisions were actually different from those provisions as stated in writing in the formal "terms and conditions" attached to the McClanathan proposal. Otherwise, Fredonia is left with the express written provisions of the February 6 proposal which preclude RCA's liability.

■ We cannot agree that the jury could "reform" the contract. The judgment of the District Court as to breach of contract must be reversed and remanded for a new trial since the jury's answers do not "represent a logical and probable decision on the relevant issues as submitted". Colvin, Prigmore v. Dempsey—Tegler & Co., Inc., 5 Cir., 1973, 477 F.2d 1283, 1285 (1973). See also Griffin v. Matherne, 5 Cir., 1973, 471 F.2d 911, 915 and cases cited therein.

Fredonia's claim for damages for fraud may, however, stand independently of the contract claim.

## II. *Repudiation of the Contract*

■ In Question No. 11 the jury found that RCA repudiated the contract by deliberately withholding shipment of the equipment until Fredonia executed the Conditional Sales Agreement [Question 11(a)]; by delivering equipment on a delayed, erratic, and incomplete basis [Question 11(b)]; by delivering equipment not suitable for the use for which it was intended and not suitable as is generally sold on the market [Question No. 11(c)]; by withholding personnel necessary to supervise the installation of the equipment [Question No. 11(d)]; and by failing after notice to repair defective equipment [Question No. 11 (e)].

RCA objected to Question No. 11 at the trial level and renews its objection on appeal. RCA argues that Question No. 11 is improper for two reasons. First, RCA contends that the actions of RCA found by the jury to have been repudiation deal with the quality of RCA's performance and not with actions "which render performance impossible or demonstrate a clear determination not to continue with performance". RCA contends that this is the way repudiation is described in Comment 1 to U.C.C. § 2–610, V.T.C.A. Bus. & C. § 2–610.[7]

---

scheme. This deferred payment scheme, as discussed *infra*, was set out in a conditional sales agreement. This conditional sales agreement became part of the contract that Fredonia affirmed.

7. Comment 1 to U.C.C. § 2–610, V.T.C.A. Bus. & C. § 2.610, states as follows:

With the problem of insecurity taken care of by the preceding section and with provision being made in this Article as to the effect of a defective delivery under an installment contract, anticipatory repudiation centers upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance.

Second, RCA asserts that the jury was not instructed properly as to U.C.C. § 2–610, V.T.C.A. Bus. & C. § 2.610, since there was no instruction that repudiation (as it is defined in U.C.C. § 2–610, V.T.C.A. Bus. & C. § 2.610) required a loss that would "substantially impair the value of the contract to the other" party.

As to repudiation, the District Court instructed the jury as follows:

Repudiation . . . is defined as such words or actions by a contracting party as indicate that he is not going to perform his contract in the future. It is conduct which shows a fixed intention to abandon, renounce, and refuse to perform the contract.

No Texas Court has as yet interpreted U.C.C. § 2–610, V.T.C.A. Bus. & C. § 2.-610, nor has any Court of any state in this Circuit.

RCA's contention that the jury's findings concerning RCA's actions only goes to the quality of the acts and do not have the characteristics of acts of repudiation is without merit. All the acts the jury found in Questions Nos. 11(a)– (e) could have "demonstrated in the jury's mind a clear determination [by RCA] not to continue with performance" or "actions [which would] render performance impossible". The jury was properly instructed as to this aspect of repudiation when the Court instructed the jury that "repudiation is denied by such words or actions . . . [that] indicate [that the contracting party] is not going to perform his contract in the future".

However, the District Court's instruction did not comply with the plain language of U.C.C. § 2–610, V.T.C.A. Bus. & C. § 2.610, which states:

When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may

(1) for a commercially reasonable time await performance by the repudiating party; or

(2) resort to any remedy for breach (Section 2—703 or Section 2—711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and

(3) in either case suspend his own performance or proceed in accordance with the provisions of this Article on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods (Section 2—704).

■ Clearly, a repudiation is not actionable unless it "substantially impairs the value of the contract". Comment 3 to U.C.C. § 2–610, V.T.C.A. Bus. & C. § 2.610, describes the test to determine if the substantial value of the contract has been impaired as whether a "material inconvenience or injustice will result".

■ The District Court's instruction was incorrect since it did not tell the jury that for it to find repudiation there must be a substantial impairment of the contract, and it did not define substantial impairment. Therefore, the jury's determination that RCA repudiated the contract cannot stand.[8]

III.  *Fraud*

A.  Delivery and Supervision

In Questions Nos. 1, 2, and 6 the jury made findings as to whether RCA made certain fraudulent misrepresentations to Fredonia. The jury found in Question No. 1 that the defendant warranted and represented that if it got the contract it would deliver the equipment so as to meet the air date of June 1, 1969. The jury found in Question No. 2 that the defendant warranted and represented that if it got the contract it would supervise the installation of the equip-

8.  See *infra* our discussion as to the measure of damages for repudiation.

ment. The jury further found in subparts to Questions Nos. 1 and 2 that (1) the representations as to delivery date and supervision were made for the purpose of inducing the plaintiff into a contract [Questions 1(b) and 2(b)]; (2) the representations as to delivery date and supervision were believed and relied upon by Fredonia [Questions 1(c) and 2(c)]; (3) the representations as to delivery date and supervision were made with the intent, design, and purpose of deceiving the plaintiff [Questions 1(d) and 2(d)]; and (4) the representations as to delivery date and supervision were a proximate cause of Fredonia's damages [Questions 1(e) and 2(e)].

The jury found in Question No. 6(a) that the plaintiff relied on the defendant's agents' statements as to delivery date. The jury further found in Question No. 6(b) that the plaintiff relied on the defendant's agents' statements as to the supervision that the defendant would furnish. However, in Question No. 6(c) the jury was asked whether the plaintiff's reliance on the defendant's agents' statements as to date of delivery and supervision of the installation was justified. *The jury answered that the reliance "was not justified".*

After the jury returned its answers to the questions on liability, the District Court realized that there was a possible inconsistency[9] to the jury's answer in No. 6(c) [where the jury found reliance was not justified] with the jury's answers in Nos. 1(c), 2(c), 6(a), and 6(b) [where the jury found Fredonia relied on RCA's statements].

The District Court in its order denying RCA's posttrial motions held it not to be required that the reliance induced by the alleged fraudulent conduct must be reasonable. The District Court, citing no cases, stated the law to be:

> [i]f an actor induces another by fraudulent misrepresentations to rely on a false promise, and a detriment thereby is suffered by that other, the actor is guilty of fraud although the other's reliance on the promise was unreasonable.

RCA contends that if the reliance was not justified as to these two misrepresentations, then there can be no recovery in damages stemming from these two misrepresentations. RCA states that Texas cases require that for fraud to attach the reliance must be reasonable.

This Court said in Edwards v. Allied Chemical, 5 Cir., 1969, 414 F.2d 60 that:

> Texas allows recovery for fraud only where the defrauded party 'had a right to rely' on the misrepresentation. Bell v. Henson, Ct. of Civil Appeals, 1934, 74 S.W.2d 455 (err. dism'd).

*Id.* at 64.

We must agree with RCA that the District Court erred and that the reliance must be justified. Any damages stemming from RCA's fraudulent misrepresentations as to date of delivery and installation of the equipment cannot lie. Therefore, we need not consider other reasons RCA alleged for overturning the jury's findings in Questions Nos. 1 and 2.

**B. Merchantability of the Equipment**

In Question No. 3(a) the jury found that the defendant represented that it would deliver in the future goods suitable to be sold in the market and suitable for the use which they are intended. The jury further found in suc-

---

9. The District Court contemplated resubmitting these questions to the jury. After a discussion with attorneys for both sides, the District Court decided that the verdict for the plaintiff was supported by the jury's findings in other questions where the jury found that the defendant breached or repudiated the contract. Attorneys for both parties agreed resubmission was not necessary. Under Rule 49(a) resubmission is not allowed. Rule 49(b), however, does provide for resubmission. See Griffin v. Matherne, *supra* at 917 n. 6.

ceeding subparts to Question No. 3 that such representation was untrue and made for the purpose of inducing the plaintiff to enter into the contract [3(b)], such representation was relied upon by the plaintiff [3(c)], and such representation was a proximate cause of plaintiff's damages [3(d)]. Unlike in Questions Nos. 1 and 2 the jury was not asked to find in Question No. 3 whether such representation as to the suitability of the goods was made with the intent, design, and purpose of deceiving the plaintiff.

RCA claims that as a matter of Texas law, the jury cannot find fraud unless it finds the defendant had the intent and design to defraud the plaintiff.

■ This is correct, Hazle v. Mc-Donald, 449 S.W.2d 343, 345 (Tex.Civ. App.1969) and Dobbs v. Camco, Inc., 445 S.W.2d 565, 570 ref. n. r. e. (Tex.Civ. App.1969). When the fraud involves future performance as was involved in Question No. 3 regarding the future delivery of suitable equipment, then there must be at the time the misrepresentation is made an intent not to perform the promised act. Medina v. Sherrod, 391 S.W.2d 66 (Tex.Civ.App.1965). Therefore, the District Court erroneously omitted a question as to whether RCA had an intent to deceive at the time it represented it would deliver suitable equipment.

However, Fredonia is correct in asserting that, under Rule 49(a), Fed.R. Civ.P., as to any omitted question, it is deemed that the court made a finding on the issue omitted in accordance with the judgment on the special verdict. L'Urbaine Et La Seine v. Rodriquez, 5 Cir., 1959, 268 F.2d 1, 4 and John R. Lewis, Inc. v. Newman, 5 Cir., 1971, 446 F.2d 800, 805. Since RCA made no objection at the trial to the omitted question, RCA's objection on appeal comes too late. *Id.* and authorities cited therein.

**C. Misrepresentation as to What Constituted the Contract**

■ In Question No. 4 the jury found that the defendant represented that the plaintiff's delivery of the February 6, 1969, acceptance letter together with its check for $25,000 would constitute an acceptance of the plaintiff's proposal of January 15, 1969, so as to constitute a valid binding contract between the parties. RCA raises for the first time on appeal numerous objections to this question. RCA's failure to object at trial is waiver of the right to protest on appeal. Safeway Stores v. Dial, 5 Cir., 1963, 311 F.2d 595, 600 reh. den. 314 F.2d 33; Simmons v. Union Terminal Company, 5 Cir., 1961, 290 F.2d 453, 454; and Clegg v. Hardware Mutual Casualty Co., 5 Cir., 1959, 264 F.2d 152, 158.[10]

**D. Error in the Instructions as to Misrepresentation**

■ RCA also claims, as it did at trial, that the District Court erroneously allowed the jury to assess damages for the misrepresentations as to which the jury found that reliance was not justified. RCA contends that this occurred when the District Court instructed the jury as to damages as follows:

> In assessing the actual damages, if any, sustained by Fredonia Broadcasting Corporation, Incorporated, you may consider all such damages as were proximately caused by the conduct you have already found on the part of the Defendant, RCA. . . .

The Court before it made the statement about which RCA complains instructed the jury as follows:

> Fredonia Broadcasting Corporation, Incorporated, must show a causal connection between the breach and repudiation of the contract and the breach of the warranty of merchantability and the alleged damages. Thus, you

---

10. This same waiver rule applies under Rule 49(b). See the following cases: Nimnicht v. Evans, 5 Cir., 1973, 477 F. 2d 133 (1973) and Wyoming Construc-tion Company v. Western Casualty & Surety Company, 10 Cir., 1960, 275 F.2d 97, cert. den. 362 U.S. 976, 80 S.Ct. 1061, 4 L.Ed.2d 1011.

should award to the Plaintiff such damages, if any, as you find from a preponderance of the evidence or the direct, natural and proximate result of the breach and repudiation of the contract and breach of warranty of merchantability and that were within the contemplation of the parties at the time of the making of the contract.

By this instruction, the Court limited the findings of damages to three specific types of conduct on the part of RCA. The court's allusion to "all such conduct as you already have found" would refer to these three types of conduct mentioned previously and would not allow the jury to consider other conduct which it had already found.

■ The Court's instruction did not permit the jury to consider or award damages for any type of fraud committed by RCA.[11] The charge to the jury must be taken as a whole and not considered in fragments, Garrett v. Campbell, 5 Cir., 1966, 360 F.2d 382, 386, 387 and cases cited therein, and, therefore, we find no error in the charge.

However, since the jury erroneously awarded damages for breach of contract, as discussed *supra*, the jury's determination of the amount of damages cannot stand. Damages are discussed *infra*.

E. Strict Liability

■ Fredonia claims that the jury's answers to Questions Nos. 3(a), 17(a), and 17(b) made RCA liable under strict liability.

Section 402A(1) of the Restatement of Torts 2d titled Special Liability of Seller of Product for Physical Harm to User or Consumer states:

One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property.

No physical harm was done to Fredonia's property as a result of the defective condition of any product RCA sold Fredonia. Fredonia suffered only economic loss, and the doctrine of strict liability is not applicable to such losses. Thermal Supply of Texas, Inc. v. Asel, 468 S.W.2d 927, 929 (Tex.Civ.App.1971) and Eli Lilly and Company v. Casey, 472 S. W.2d 598, 599 (Tex.Civ.App.1971).

IV. *Damages*

A. Warranty

■ RCA argues that the damages for breach of warranty should be limited by the language of the January 15, 1969, proposal which states that "the fulfillment of RCA's obligation in respect [to] the equipment furnished" shall be correction of "defects by repair or replacement at RCA's factory". RCA contends that U.C.C. § 2–719, V.T.C.A. Bus. & C. § 2.719, expressly sanctions the contractual limitation of a seller's liability to the repair or replacement of nonconforming goods. RCA states further that U.C.C. § 2–719, V.T.C.A. Bus. & C. § 2.719, allows this contractual limitation to be the buyer's sole remedy.

Fredonia argues in response that the contractual limitation cannot apply since (1) fraud "vitiated" the contract and (2) U.C.C. § 2–719, V.T.C.A. Bus. & C. § 2.719, is inapplicable because of RCA's fraud in inducing the contract. Furthermore, Fredonia states that U.C.C. § 2–719, V.T.C.A. Bus. & C. § 2.719, does not allow unconscionable and unreasonable limiting provisions.

---

11. It should be noted that the District Court in a colloquy with RCA's counsel about the matter stated that "he didn't submit to the jury anything relating to the alleged fraudulent misrepresentation". It should also be noted that the jury's finding of fraudulent warranty of the equipment in Question No. 3 was not effected by the jury's finding in Question No. 6(c) that the reliance was not justified. Question No. 6(c) covered only RCA's fraudulent representation as to date of delivery and degree of supervision. In addition, the District Court in its instruction on damages quoted previously did not instruct the jury that damages could be awarded for the fraudulent warranty.

The language of the provision in the January 15, 1969, proposal limiting RCA's liability for breach of warranty is as follows:

\* \* \* RCA agrees to make good f.o.b. its factory, all defective parts which are returned to RCA's factory, transportation prepaid, provided that our examination discloses that the defects are due to defective workmanship or material and that the equipment has not been misused, altered, repaired or improperly installed. Correction of such defects by repair or replacement at RCA's factory and the shipment of the repaired or replacement parts to you f.o.b. RCA's factory, shall constitute the fulfillment of all RCA's obligations in respect of the equipment furnished hereunder. You agree that except for such repair and replacement, RCA shall in no event be liable for damages of any kind connected with the use of the equipment or its failure to function properly.

Section 2–719, V.T.C.A. Bus. & C. § 2.719, provides as follows:

(a) Subject to the provisions of Subsections (b) and (c) of this section and of the preceding section on liquidation and limitation of damages,

(1) the agreement may provide for remedies in addition to or in substitution for those provided in this chapter and may limit or alter the measure of damages recoverable under this chapter, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts; and

(2) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

(b) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title.

(c) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

Section 2–719(a)(1), V.T.C.A. Bus. & C. § 2.719(a)(1), clearly provides that the seller may limit the buyer's remedy to "repair and replacement of non-conforming goods or parts". This same section also states that this remedy may be in "*substitution* for those [remedies] provided in this chapter". (emphasis added.)

Section 2–719(a)(2), V.T.C.A. Bus. & C. § 2.719(a)(2), provides that a remedy provided is optional unless it is "expressly agreed to be exclusive". The language of limitation in RCA's January 15, 1969 proposal does not state explicitly that the remedy provided for is to be the exclusive remedy. However, it is clear that the contractual limitation is intended to be exclusive because the language of the contractual limitation states that repair and replacement "shall constitute the fulfillment of *all* RCA's obligations in respect of the equipment furnished". [Emphasis added.] Cf. Dow Corning Corporation v. Capital Aviation, Inc., 7 Cir., 1969, 411 F.2d 622, 626.

Section 2–719(a)(1), V.T.C.A. Bus. & C. § 2.719(a)(1), allows a seller to limit the buyer's warranty to repair and replacement and thus limit liability. Southwest Forest Indus., Inc. v. Westinghouse Elec. Corp., 9 Cir., 1970, 422 F.2d 1013, 1020 and Lankford v. Rogers Ford Sales, 478 S.W.2d 248, 251 (Tex. Civ.App.1972). See also Annot. 17 A.L. R.3d 1010, 1122 and cases cited therein.

■ Fredonia also claims that the contractual limitation cannot apply because as stated in U.C.C. § 2–719(a)(2), V.T.C.A. Bus. & C. § 2.719(a)(2), the limited remedy fails of its essential purpose. We do not agree, for the facts clearly show that RCA obeyed the limitation by repairing and replacing items which Fredonia claims were defective.

See Lankford v. Rogers Ford Sales, *supra* at 251; County Asphalt, Inc. v. Lewis Welding & Engineering Corp., 323 F.Supp. 1300, 1309 (S.D.N.Y.1970), affirmed 2 Cir., 1971, 444 F.2d 372; Jones & McKnight Corp. v. Birdsboro Corp., 320 F.Supp. 39, 42 (N.D.Ill., E.D. 1970), and Comment 1 to U.C.C. § 2-719, V.T.C.A. Bus. & C. § 2.719.

Fredonia's contention that the contract limitation cannot apply because the contract was induced by fraud has no merit since, as we have already discussed, when Fredonia decided to affirm the contract and sue for its breach, it must be bound by the contract terms.

Fredonia's claim that the contract limitation is unconscionable raises a question that the court below did not decide.

The jury's determination in (1) Question 4 as to what the defendant represented the contract to be or (2) in Question 3 as to what the defendant represented the quality of the goods to be has no bearing on whether the contract limitation was unconscionable.

U.C.C. § 2-302, V.T.C.A. Bus. & C. § 2.302, covers unconscionability and provides as follows:

(a) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

(b) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

Comment 1 to Section 2-302, V.T.C.A. Bus. & C. § 2.302 states:

This section is intended to allow the court to pass directly on the unconscionability of the contract or particular clause therein and to make a conclusion of law as to its unconscionability. The basic test is whether, in the light of the general commercial background, and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract.

U.C.C. § 2-302, V.T.C.A. Bus. & C. § 2.302, requires that the District Court make a determination whether the limitation was unconscionable. On remand [12] the District Court should consider the commercial setting in which the contract was formed. See County Asphalt, Inc. v. Lewis Welding & Engineering Corp., *supra* 323 F.Supp. at 1308, and Comment 1 to U.C.C. § 2.302, V.T.C.A. Bus. & C. § 2.302.

### B. Consequential Damages

Section 2-719(c), V.T.C.A. Bus. & C. § 2.719(c), provides as follows:

Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

The language of the January 15, 1969, proposal limited RCA's liability for consequential damages by the following language:

Neither RCA, nor you [Fredonia] shall be liable for general, special, indirect, or consequential damages in connection with any obligations created by the agreement or arising out of

---

12. The provision in RCA's contract which limits its damages for breach of warranty makes it unnecessary for us to decide what would be the correct measure of damages for breach of warranty if the contract limitation did not apply.

any acts performed in relation to such obligations. Both RCA and you acknowledge that such lack of liability, without limiting the generality of the foregoing, extends to loss of actual or anticipated revenue, loss of air time, and damages to the business reputations of either party to this agreement.

Such limitations are valid and enforceable. County Asphalt, Inc. v. Lewis Welding & Engineering Corp., 323 F. Supp. 1300, 1308 (S.D.N.Y.1970) affirmed 2 Cir., 1971, 444 F.2d 372. Fredonia again contends that such limitation was unconscionable.

The District Court below did not make such a finding as required by U.C.C. § 2–302, V.T.C.A. Bus. & C. § 2.302, and therefore, we cannot decide the issue.

### C. Repudiation

■ RCA objected to the District Court's instruction on the measure of damages for repudiation. The District Court's instruction was as follows:

You are instructed that in assessing the actual damages, if any, sustained by Fredonia Broadcasting Corporation, Incorporated, you may consider . . . [the] damages . . . [for repudiation to be] the loss of value of Fredonia's television station business, taking into account the loss of value between the value of the business and its future potential before the station ceased operation and the value of the business after it ceased operation, lost its CBS affiliation and became insolvent.

You may also consider the replacement cost of items of defective equipment furnished by RCA to Fredonia.

RCA contends that the proper measure of damages for repudiation is codified in U.C.C. § 2–713, V.T.C.A. Bus. & C. § 2.713, which provides as follows:

(a) Subject to the provisions of this chapter with respect to proof of market price (Section 2.723), the measure of damages for nondelivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this chapter (Section 2.715), but less expenses saved in consequence of the seller's breach.

(b) Market price is to be determined as of the place for tender or, in cases of rejection after arrival or revocation of acceptance, as of the place of arrival.

■ Clearly, the District Court's instruction on measure of damages for repudiation in light of U.C.C. § 2–713(a), V.T.C.A. Bus. & C. § 2.713(a), was not correct. No Texas Court has yet interpreted U.C.C. § 2–713, V.T.C.A. Bus. & C. § 2.713, but that section is similar to pre-Code Texas law which states that "the measure of damages for undelivered goods . . . is the difference in the contract price and the market price at the time and place of the breach". Henderson v. Otto Goedecke, Inc., 430 S.W.2d 120, 123 (Tex.Civ.App.1968); Otto Goedecke, Inc. v. Henderson, 388 S.W.2d 728, 730 (Tex.Civ.App.1965); Idalou Cooperative Cotton Gin v. Gue, 317 S.W.2d 240, 247 (Tex.Civ.App. 1958); Pace Corporation v. Jackson, 155 Tex. 179, 284 S.W.2d 340, 347 (1955); and Vise v. Foster, 247 S.W.2d 274, 281 (Tex.Civ.App.1952). The only difference between U.C.C. § 2–713(a), V.T.C.A. Bus. & C. § 2.713(a), and pre-Code Texas law is that U.C.C. § 2–713(a), V.T.C.A. Bus. & C. § 2.713(a), specifies that the market price is the price at the time when the buyer learned of the breach.[13]

RCA also contends that it was error for the trial judge to permit damages for both repudiation of the contract and breach of warranty of merchantability of the contract since such theories of

---

13. U.C.C. § 2–713(b), V.T.C.A.Bus. & C. § 2.713(b), specifies that market price is to be determined as of the place for tender.

liability are mutually exclusive. RCA states that these two theories of relief are inconsistent because "repudiation is a failure to make performance not yet due under a contract" while "breach of warranty of merchantability is necessarily a claim of inadequate performance under a contract".

Fredonia argues in opposition that it can try its case on several distinct theories and is not required to elect one remedy to the exclusion of others. Fredonia further states that the measure of actual damages does not differ under the different liability theories it urges.[14]

Fredonia is correct in stating that it can plead under the Federal Rules of Civil Procedure as many theories of relief it has regardless of their consistency. Pulliam v. Gulf Lumber Co., 5 Cir., 1963, 312 F.2d 505, 507 and Breeding v. Massey, 8 Cir., 1967, 378 F.2d 171, 178. However, a judgment cannot be supported by inconsistent theories if one theory precludes the other or is mutually exclusive of the other. Cf. Telex Corporation v. Balch, 8 Cir., 1967, 382 F.2d 211, 213.

Under Texas law prior to the advent of the Uniform Commercial Code, a party faced with anticipatory repudiation could not claim damages for the anticipatory breach and at the same time treat the contract as in force. Lumbermens Mutual Casualty Company v. Klotz, 5 Cir., 1958, 251 F.2d 499, 506 (citing Texas cases). See also Reliance Cooperage Corp. v. Treat, 8 Cir., 1952, 195 F.2d 977, 981–982.

The Uniform Commercial Code Sections 2–610, V.T.C.A. Bus. & C. § 2.610; 2–711, V.T.C.A. Bus. & C. § 2.711; and 2–106(d), V.T.C.A. Bus. & C. § 2.106(d) require that prior Texas case law give way. No Texas case nor any other state court in this Circuit has faced this exact problem. Therefore, we look to the provisions of the Uniform Commercial Code for an interpretation, as would a Texas state court.

U.C.C. § 2–610, V.T.C.A. Bus. & C. § 2.610, allows the aggrieved party to sue for breach and retain any remedy for breach of the whole contract. U.C.C. § 2–610, V.T.C.A. Bus. & C. § 2.-610, provides as follows:

When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may

(1) for a commercially reasonable time await performance by the repudiating party; or

(2) resort to any remedy for breach (Section 2.703 or Section 2.711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and

(3) in either case suspend his own performance or proceed in accordance with the provisions of this chapter on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods (Section 2.704).

The alternative remedies of U.C.C. § 2–610, V.T.C.A. Bus. & C. § 2.610, are stated in the disjunctive. Under U.C.C. § 2–610(1), V.T.C.A. Bus. & C. § 2.-610(1) the aggrieved party can refuse to accede to an anticipatory repudiation and can choose not to sue for the antici-

---

14. Fredonia is also incorrect that the measure of damages for breach of warranty and repudiation is the same. U.C.C. § 2–714(b), V.T.C.A.Bus. & C. § 2.714(b), states that the measure of damages for breach of warranty is as follows:

(b) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

This measure of damages is obviously not the same as the measure of damages for repudiation provided for in U.C.C. § 2–713(a), V.T.C.A.Bus. & C. § 2.713(a), laid out in the text *supra*.

patory repudiation. When the aggrieved party follows this course, the contract remains in existence. Under U.C.C. § 2–610(2), V.T.C.A. Bus. & C. § 2.610(2), the aggrieved party can also treat the anticipatory repudiation as a breach and resort to his remedies under U.C.C. § 2–711, V.T.C.A. Bus. & C. § 2.711. U. C.C. § 2–711(a), V.T.C.A. Bus. & C. § 2.711(a), provides as follows:

(a) Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (Section 2.612), the buyer *may cancel* and whether or not he has done so may in addition to recovering so much of the price as has been paid

(1) "cover" and have damages under the next section as to all the goods affected whether or not they have been identified to the contract; or

(2) recover damages for non-delivery as provided in this chapter (Section 2.713).

[Emphasis added]

The key word in U.C.C. § 2–711(a), V.T.C.A. Bus. & C. § 2.711(a), is "cancel"[15] which is defined in U.C.C. § 2–106(d), V.T.C.A. Bus. & C. § 2.-106(d), as follows:

(d) "Cancellation" occurs when either party puts an end to the contract for breach by the other and its effect, is the same as that of "termination" except that the cancelling party also retains any remedy for breach of the whole contract or any unperformed balance.

Thus, the aggrieved party when faced with an 'anticipatory repudiation can seek his remedies for breach as provided in U.C.C. § 2–711(a) and (b), V.T.C.A. Bus. & C. § 2.711(a) and (b), and can also maintain an action for breach of the contract such as a suit for a breach of warranty. See 67 Am.Jur.2d, Sales § 516.

Therefore, Fredonia can seek under the Uniform Commercial Code damages for the anticipatory repudiation and for breach of warranty. However, as we have discussed previously, Fredonia's claim for damages for breach of warranty is negated by the terms of the contract that it elected to affirm.

### D. Fraudulent Representation

RCA contends that the District Court erroneously instructed the jury as to the measure of damages for fraud. Specifically, RCA claims that the District Court's instruction on damages [which is set out *in toto* in Part III D of this opinion *supra*] was an instruction as to the measure of damages for fraud.

The District Court's instruction on damages as we have previously said in Part III D does not instruct the jury to consider damages for fraud. The instruction only pertains to the three types of conduct that are specifically enumerated. See our discussion in Part III D. Therefore, there cannot be an erroneous instruction as to damages on fraud.[16]

### E. Lost Profits

The District Court initially instructed the jury as to future or lost profits as follows:

[Y]ou may consider all such damages as were proximately caused by the conduct you have already found on the part of the Defendant, RCA, in-

---

15. The definition of "cancellation" should be contrasted with the definition of "termination" in 2–106(c), V.T.C.A.Bus. & C. § 2.106(c) which provides as follows: "Termination" occurs when either party pursuant to a power created by agreement or law puts an end to the contract otherwise than for its breach. On "termination" all obligations which are still executory on both sides are discharged but any right based on prior breach or performance survives.

16. If fraud is alleged at the new trial when the case is remanded, the District Court must consider, as establishing the measure of damages for fraud, the effect of U.C.C. § 2–721, V.T.C.A.Bus. & C. § 2.721, and the other sections of the code to which it refers.

cluding the loss of value of Fredonia's television station business, taking into account the loss of value between the value of the business and its *future potential* before the station ceased operation and the value of the business after it ceased operation, lost its CBS affiliation and became insolvent.

You may also consider the replacement costs of items of defective equipment furnished by RCA to Fredonia. [Emphasis added]

RCA objected to the charge of the District Court. RCA stated that under Texas law the jury under the facts of this case could not award future profits to a new and unestablished business. The District Court agreed to correct its charge and or give an instruction on future profits. The District Court's corrected instruction was as follows:

You are instructed that one of the elements of damage as it relates to alleged future potential loss—as it relates to the alleged future potential of Plaintiff's television station, is a loss of profits that the Plaintiff allegedly anticipated from the contract in question.

In this connection are you instructed as to this element the Plaintiff is entitled to recover only net profits. The Plaintiff is not entitled to his expected gross profits.

In determining the net profits which Plaintiff reasonably anticipated from the performance of the contract in question, you will determine that amount of money that the Plaintiff reasonably would have made over and above the expense that would· have been incurred in the production of that income. As to such anticipated future profits, which Plaintiff contends that it could reasonably have been expected to make in the ordinary course of business, but for the breach and repudiation of the contract and the breach of warranty, the Plaintiff has the burden of proving that he actually lost business as a result of the breach and repudiation of the contract

and breach of warranty, and that this loss of business resulted in a loss of net profits.

RCA objected again to the new charge on the basis that there was no evidence in the record to support a finding of lost profits.

■ Under Texas law future profits are allowed in a contract action as part of the damages to *an established business*. Atomic Fuel Extraction Corporation v. Slick's Estate, 386 S.W.2d .180, 188 (Tex.Civ.App.1964), writ ref'd n. r. e. 403 S.W.2d 784 (Tex.1966). When the business is new and unestablished, future profits have been consistently denied under Texas law. *Id.* at 189. It was made very clear in Atomic Fuel Extraction Corporation v. Slick's Estate, *supra*, that in those cases where future profits were allowed to be recovered, "there was some data and history of profits from an established business". *Id.* at 188 (citing Texas cases). In the more recent Texas case of Southwest Bank & T. Co. v. Executive Sportsman Ass'n, 477 S.W.2d 920 (Tex.Civ.App. 1972), the Court reaffirmed this rule and said:

[T]he case . . . is governed by the well-established rule that prospective profits from a new enterprise which has no history of profits are too remote and speculative to be included in compensatory damages (citing Texas cases).

*Id.* at 929.

■ Fredonia contends that future profits are permitted to be awarded to new enterprises under our decision in Mechanical Wholesale, Inc. v. Universal-Rundle Corp., 5 Cir., 1970, 432 F.2d 228. In that decision we made it very clear that the factor that the enterprise was new was not controlling, but rather what was conclusive was the record of profits of the enterprise. We said in Mechanical Wholesale, Inc. v. Universal-Rundle Corp., *supra*, as follows:

[T]he mere fact that Mechanical was a new business does not automatically exclude its claim for future lost

profits. Pace Corp. v. Jackson, supra [155 Tex. 179, 284 S.W.2d 340]. Though new, Mechanical had a rapidly growing business. There was evidence from which the jury could have concluded that but for the breach Mechanical's commercial business would have grown at the same rate its other sales grew. Mechanical was entitled to recover profits which would have accrued from any normal increase in business if that increase failed to occur as a result of Rundle's breach.

Fredonia's financial records show clearly that in no month during the time that the station was on the air did it make a profit. Fredonia was also operating in an unfavorable business climate. Its station, which was a UHF station, was in competition in the same town with a VHF station. Fredonia's president, Cudlipp, admitted that a UHF station was not as favorable as a VHF station since not all television sets are equipped to receive UHF channels. Therefore, the District Court erred in submitting lost prospective profits as an element of Fredonia's damages.

### F. Exemplary Damages

■■ RCA is correct in stating that the District Court erred in awarding Fredonia exemplary damages. We stated previously in Part III D that the District Court's instruction did not permit the jury to consider or award damages for fraud. Therefore, the District Court was permitting the jury to award exemplary damages for Fredonia's claims based on breach of contract, breach of warranty, or repudiation. Texas law is clear that exemplary damages cannot be awarded for a contract action. Success Motivation Institute, Inc. v. Jamieson Film Co., 473 S.W.2d 275, 282 (Tex.Civ.App.1971); Graham v. Turner, 472 S.W.2d 831, 839 (Tex. Civ.App.1971); Export Ins. Co. v. Her-

rera, 426 S.W.2d 895, 900, ref. n. r. e. (Tex.Civ.App.1966); and McDonough v. Zamora, 338 S.W.2d 507, 513 (Tex.Civ. App.1960).

### G. Absence of Evidence of Damages [17]

RCA contends that the damages found by the jury to have proximately resulted from RCA's breach of contract, breach of warranty, and repudiation were not supported by evidence of monetary loss.

We agree that Fredonia did not prove its damages to the required reasonable certainty.

■■ Of course, Fredonia's recovery of damages may not be defeated because it failed to prove its damages with exactness. Southwest Battery Corp. v. Owen, 131 Tex. 423, 115 S.W.2d 1097, 1099 (Tex.S.Ct.1938). Damages in a contract action must be based on evidence that affords a sufficient basis for estimating their amount in money with *reasonable* certainty. Schoenberg v. Forrest, 253 S.W.2d 331, 334 (Tex.Civ. App.1952) and authorities cited therein. While it is true that a party who breaches a contract cannot escape liability because it is impossible to state or prove a perfect measure of damages, Southwest Battery Corp. v. Owen, *supra* 115 S.W.2d at 1099, it is also true that a defendant in a contract action cannot be assessed with damages that are based on mere opinion and do not rise to the level of a reasonable certainty. Schoenberg v. Forrest, *supra* 253 S.W.2d at 336.

■ Clearly, Fredonia should have presented evidence of its damages that would have been more convincing. This is not a case of proven damages uncertain in amount, but rather damages that were not proved at all to a reasonable certainty. Jordan v. Cartwright, 347 S. W.2d 799, 801 (Tex.Civ.App.1961). Cf. Household Goods Carriers' Bureau v. Terrell, 5 Cir., 1969, 417 F.2d 47, 53.

17. We are not discussing in this section of the opinion the proper *measure* of damages to be used, but are discussing only the sufficiency of the evidence. In other parts of this opinion we have discussed where appropriate the measure of damages for a particular cause of action that was alleged.

RCA claims further that it was improper for the jury to base its award of damages on the opinion of Fredonia's expert witness, Norman Fischer, as to the value of the enterprise at various points in time.

In Texas, as contrasted to other jurisdictions, witnesses are allowed to give their opinion as to the value of property before and after it is injured. Southwestern Bell Telephone Company v. Willie, 329 S.W.2d 466, 467 (Tex.Civ. App.1959) and Houston & T.C.R. Co. v. Ellis, 111 Tex. 15, 224 S.W. 471 (1920). The distinction is not with the method Fredonia used in proving damages but rather with the method's inexactness in the present case.

## V. The Counterclaim

RCA counterclaimed for the amount due on the broadcast equipment it delivered. The counterclaim was based on the conditional sales agreement that Fredonia signed. The counterclaim was denied on the basis of the jury's answer to Question No. 18 where the jury found that Fredonia signed involuntarily because of coercion by RCA the conditional sales agreement and the accompanying promissory notes.

On appeal RCA contends that the District Court erred in not granting RCA's motion for a directed verdict on this issue because "there was no conflict in substantial evidence which would create a jury question on the issue of coercion".

Fredonia claims that this court cannot consider on appeal the sufficiency of the evidence because RCA did not object to the instruction or Question No. 18 concerning coercion. Fredonia further argues that the evidence was sufficient to support the jury's finding of coercion.

Fredonia's argument misses the point. RCA's objection to Question No. 18 does not go to the *form* of Question No. 18 or the *submission* of Question No. 18 to the jury, but rather RCA's objection is to the sufficiency of the evidence supporting the jury's finding in Question No. 18. Cf. Clegg v. Hardware Mutual Casualty Co., 5 Cir., 1959, 264 F.2d 152, 158 and Merrill v. Beaute Vues Corporation, 10 Cir., 1956, 235 F. 2d 893, 897. RCA preserved its objection to the sufficiency of the evidence as to coercion by renewing its motion for a directed verdict at the close of all the evidence and by asking for a judgment notwithstanding the verdict after entry of the judgment. Rule 50(b), Fed.R. Civ.P. See Hernandez v. Employers Mut. Liab. Ins. Co., 5 Cir., 1965, 346 F. 2d 154, 155, Travelers Ins. Co. v. Stanley, 5 Cir., 1958, 252 F.2d 115, and 5A Moore's Federal Practice § 50.05[1].

The evidence did not support a finding of coercion. It clearly shows the following: (1) McFarland admitted that he knew at the time he prepared the acceptance letter of February 6, 1969, that RCA would require the signing of a conditional sales agreement, (2) McFarland further testified that the February 6, 1969, acceptance letter contemplated the signing of a conditional sales agreement, (3) the January 15, 1969, proposal states that if the buyer agrees to deferred payment terms then the buyer agrees to execute RCA's standard form of deferred payment contract, and (4) there was no evidence that RCA made any demands that it did not have a legal right to make. Therefore, on this evidence there can be no doubt that reasonable men could not have arrived at a contrary verdict. Boeing Company v. Shipman, 5 Cir., 1969, 411 F.2d 365, 374.

We conclude that the District Court erred in denying RCA's motion for a directed verdict on the coercion issue.

## VI. Summary

By reason of the complexity of this litigation, we deem it appropriate to summarize our holdings:

(1) The jury found that Fredonia affirmed the contract. Fredonia's breach claims are precluded by the terms of the contract it affirmed. Damages awarded for breach of contract may not be allowed.

(2) The jury's determination that RCA repudiated the contract cannot stand because the District Court's instruction on repudiation was erroneous. The District Court also erroneously instructed the jury as to the measure of damages for repudiation. Fredonia can seek damages for both repudiation and breach of warranty. If on remand, the District Court finds that the terms are not unconscionable, then Fredonia's claim for breach of warranty will be foreclosed.

(3) The jury's findings that RCA made misrepresentations as to date of delivery and degree of supervision are negated by the jury's finding that such reliance was not justified. The jury's finding as to RCA's misrepresentation stands. However, we find that the jury was never instructed as to damages for fraud. Therefore, any damages that the jury awarded do not include damages for misrepresentations. On remand, if Fredonia seeks relief under a claim for fraud, it need only seek to prove damages as to the misrepresentation as to merchantability. Fredonia's fraud claims stand independent of its contract actions. Fredonia cannot seek damages under the theory of strict liability.

(4) RCA's contract language prevents Fredonia from seeking damages for breach of warranty. On remand the District Court is directed to determine whether this contract language was unconscionable. The same applies to the contract's terms as to consequential damages. Fredonia cannot under Texas law seek damages for lost profits. Fredonia, on remand, can seek exemplary damages if fraud is proven. Fredonia must prove its damages to a reasonable certainty.

Reversed and remanded with instructions.

## APPENDIX A

### INTERROGATORY NO. ONE

(a) Do you find from a preponderance of the evidence that prior to or on February 6, 1969, the defendant represented, warranted, or agreed that if it got the contract with plaintiff, it would ship and deliver the equipment contracted for so as to meet the target on-the-air date of June 1, 1969?

Answer "Yes" or "No".

ANSWER: Yes

If you have answered the foregoing Interrogatory No. 1(a) "yes", and only in such event, you will complete your answer to the following parts of Interrogatory No. One.

(b) Do you find from a preponderance of the evidence that such representation, if any, by the defendant was untrue, and made for the purpose of inducing plaintiff to enter into the contract in question?

Answer "Yes" or "No".

ANSWER: Yes

(c) Do you find from a preponderance of the evidence that the plaintiff believed and relied on such representation, if any, by the defendant prior to February 6, 1969?

Answer "Yes" or "No".

ANSWER: Yes

(d) Do you find from a preponderance of the evidence that such representation, if any, was made with the intention, design, and purpose of deceiving the plaintiff and with no intention of performing that which was promised?

Answer "Yes" or "No".

ANSWER: Yes

(e) Do you find from a preponderance of the evidence that such representation, if any, was a proximate cause of plaintiff's damages, if any, as a result of the loss of its broadcasting business?

Answer "Yes" or "No".

ANSWER: Yes

## INTERROGATORY NO. TWO

(a) Do you find from a preponderance of the evidence that the defendant represented, warranted, or agreed prior to or on February 6, 1969, that if it should get the contract it would furnish its representatives to supervise the installation of the equipment supplied and furnished by it and instruct plaintiff's personnel in the operation and adjustment thereof?

Answer "Yes" or "No".

ANSWER: Yes

If you have answered the foregoing Interrogatory No. Two (a) "Yes", and only in such event, you will complete your answer to the following parts of Interrogatory No. Two.

(b) Do you find from the preponderance of the evidence that such representation by the defendant was untrue, and made for the purpose of inducing plaintiff to enter into the contract in question?

Answer "Yes" or "No".

ANSWER: Yes

(c) Do you find from a preponderance of the evidence that the plaintiff believed and relied upon such representation by the defendant prior to February 6, 1969?

Answer "Yes" or "No".

ANSWER: Yes

(d) Do you find from a preponderance of the evidence that such representation was made with the intention, design, and purpose of deceiving the plaintiff and with no intention of performing that which was promised?

Answer "Yes" or "No".

ANSWER: Yes

(e) Do you find from a preponderance of the evidence that such representation was a proximate cause of plaintiff's damages, if any, as a result of the loss of its broadcasting business?

Answer "Yes" or "No".

ANSWER: Yes

## INTERROGATORY NO. THREE

(a) Do you find from a preponderance of the evidence that the defendant warranted, represented, or agreed, prior to or on February 6, 1969, that if it should get the contract it would furnish goods of a quality such as are generally sold in the market and suitable for that which they are intended, or for the particular uses to which the goods are to be put?

Answer "Yes" of "No".

ANSWER: Yes

If you have answered the foregoing Interrogatory No. Three (a) "Yes", and only in such event, you will complete your answer to the following parts of Interrogatory No. Three.

(b) Do you find from a preponderance of the evidence that such representation by the defendant was untrue, and made for the purpose of inducing plaintiff to enter into the contract in question?

Answer "Yes" or "No".

ANSWER: Yes

(c) Do you find from a preponderance of the evidence that the plaintiff believed and relied upon such representation by the defendant prior to February 6, 1969?

Answer "Yes" or "No".

ANSWER: Yes

(d) Do you find from a preponderance of the evidence that such representation was a proximate cause of plaintiff's damages, if any, as a result of the loss of its broadcasting business?

Answer "Yes" or "No".

ANSWER: Yes

## INTERROGATORY NO. FOUR

(a) Do you find from a preponderance of the evidence that at the February 6, 1969, meeting between officials of the plaintiff and the defendant that the defendant represented that the delivery of the plaintiff's letter of acceptance to-

gether with its check for $25,000 would constitute an acceptance of the plaintiff's proposal of January 15, 1969, so as to constitute a valid, binding contract between the parties?

Answer "Yes" or "No".

ANSWER: Yes

If you have answered the foregoing Interrogatory No. Four (a) "Yes", and only in such event, you will complete your answer to the following parts of Interrogatory No. Four:

(b) Do you find from a preponderance of the evidence that such representation by the defendant was untrue, and made for the purpose of inducing plaintiff to enter into the contract in question?

Answer "Yes" or "No".

ANSWER: Yes

(c) Do you find from the preponderance of the evidence that such representation by the defendant was believed and relied upon by the plaintiff?

Answer "Yes" or "No".

ANSWER: Yes

(d) Do you find from a preponderance of the evidence that such representation was a proximate cause of plaintiff's damages, if any, as a result of the loss of its broadcasting business?

Answer "Yes" or "No".

ANSWER: Yes

## INTERROGATORY NO. FIVE

Do you find from a preponderance of the evidence that plaintiff at all times after January 1, 1969, and prior to June 1, 1969, knew, or should have reasonably known, that it was not able to begin UHF Television broadcasting on June 1, 1969?

Answer "Yes" or "No".

ANSWER: No

## INTERROGATORY NO. SIX

(d) Do you find from a preponderance of the evidence that plaintiff did

not rely on any statements of defendant's agents, George McClanathan or Dana Pratt, as to the delivery and installation of RCA equipment by June 1, 1969?

Answer "It did rely" or "It did not rely".

ANSWER: It did rely.

(b) Do you find from a preponderance of the evidence that plaintiff did not rely on any statements of defendant's agents, George McClanathan or Dana Pratt, as to the obligation of the defendant to furnish representatives to supervise the installation of the equipment and instruct plaintiff's personnel in its operation and adjustment?

Answer "It did rely" or "It did not rely".

ANSWER: It did rely.

If you have answered "It did rely" to either or both of the preceding Interrogatories Nos. 6(a) and (b), and only in such event, you will answer the following:

(c) Do you find from a preponderance of the evidence that such reliance was not justified?

Answer "It was justified" or "It was not justified".

ANSWER: It was not justified.

## INTERROGATORY NO. SEVEN

Do you find from a preponderance of the evidence that the parties intended that the defendant's proposal of January 15, 1969, coupled with the plaintiff's letter of acceptance of this proposal, dated February 6, 1969, and oral representations, if any, made to the plaintiff by the defendant, constituted the contract between the parties?

Answer "It did" or "It did not".

ANSWER: It did.

## INTERROGATORY NO. EIGHT

Do you find from a preponderance of the evidence that the Conditional Sales

Agreement signed by the plaintiff on April 20, 1969, constituted the contract between the parties?

Answer "It did" or "It did not".

ANSWER: It did not.

If you have answered Interrogatory No. Seven "It did", and Interrogatory No. Eight, "It did not", you will proceed to answer the following Interrogatories. Otherwise, it will not be necessary that they be answered by you.

## INTERROGATORY NO. NINE

Do you find from a preponderance of the evidence that the defendant breached the contract in any one or all of the following particulars:

(a) By deliberately withholding shipment to the plaintiff of the items of equipment contracted for more than 75 days after February 6, 1969, and thereafter until plaintiff completed documents submitted to it by the defendant?

Answer "Yes" or "No".

ANSWER: Yes

(b) By delivering such equipment contracted for on a delayed, erratic, and incomplete basis?

ANSWER: Yes

(c) By delivering equipment that was not of a quality such as is generally sold in the market and suitable for that which it is intended or for the particular uses to which the goods were to be put?

Answer "Yes" or "No".

ANSWER: Yes

(d) By withholding personnel necessary to supervise the installation of equipment until after June 1, 1969, and in failing to maintain such supervisory personnel on the site, except on an intermittent and irregular basis?

Answer "Yes" or "No".

ANSWER: Yes

(e) By failing, after notice, if any, to correct or remedy any such condition, or repair or replace any such equipment?

Answer "Yes" or "No".

ANSWER: Yes

If you have answered "Yes" to any one or all of the foregoing allegations of breach of contract, stated in Interrogatory No. Nine (a) through (e), and only in such event, you will then answer the following interrogatory.

## INTERROGATORY NO. TEN

Do you find from a preponderance of the evidence that any conduct of the defendant stated in Interrogatory No. Nine (a) through (e) was a proximate cause of the damages, if any, sustained by the plaintiff as a result of the loss of its television broadcasting business?

Answer "Yes" or "No".

ANSWER: Yes

## INTERROGATORY NO. ELEVEN

Do you find from a preponderance of the evidence that the defendant repudiated the contract in any one or all of the following particulars:

(a) By deliberately withholding shipment to the plaintiff of the items of equipment contracted for for more than 75 days after February 6, 1969, and thereafter until plaintiff completed documents submitted to it by the defendant?

Answer "Yes" or "No".

ANSWER: Yes

(b) By delivering such equipment contracted for on a delayed, erratic, and incomplete basis?

Answer "Yes" or "No".

ANSWER: Yes

(c) By delivering equipment that was not of a quality such as is generally sold in the market and suitable for that for which it was intended, or for the particular uses to which the goods were to be put?

Answer "Yes" or "No".

ANSWER: Yes

(d) By withholding personnel necessary to supervise the installation of

equipment until after June 1, 1969, and in failing to maintain such supervisory personnel on the site, except on an intermittent and irregular basis?

Answer "Yes" or "No".

ANSWER: Yes

(e) By failing, after notice, if any, to correct or remedy any such condition, or repair or replace any such equipment?

Answer "Yes" or "No".

ANSWER: Yes

If you have answered "Yes" to any one or all of the foregoing allegations of repudiation of contract, stated in Interrogatory No. Eleven (a) through (e), and only in such event, you will then answer the following interrogatory.

## INTERROGATORY NO. TWELVE

Do you find from a preponderance of the evidence that any conduct of the defendant stated in Interrogatory No. Eleven (a) through (e) was a proximate cause of the damages, if any, sustained by the plaintiff as a result of the loss of its television broadcasting business?

Answer "Yes" or "No".

ANSWER: Yes

If you have answered "Yes" to either or both of Interrogatories Numbered Ten or Twelve, and only in such event, you will answer the following Interrogatory.

## INTERROGATORY NO. THIRTEEN

Do you find from a preponderance of the evidence that plaintiff waived such breach or repudiation?

Answer "It did" or "It did not".

ANSWER: It did not.

## INTERROGATORY NO. FOURTEEN

(a) Do you find from a preponderance of the evidence that the management of plaintiff's television broadcasting business was not qualified professionally to operate a successful UHF television broadcasting station?

Answer "It was" or "It was not".

ANSWER: It was.

If you have answered Interrogatory No. Fourteen "It was", and only in such event, then you will answer the following Interrogatory:

(b) Do you find from a preponderance of the evidence that such lack of professional qualifications on the part of the plaintiff's management proximately caused the damage, if any, resulting from the loss of plaintiff's television broadcasting business?

Answer "Yes" or "No".

ANSWER: No.

## INTERROGATORY NO. FIFTEEN

(a) Do you find from a preponderance of the evidence that the engineering and technical staff of plaintiff's television broadcasting business was not qualified technically by experience or training to operate successfully a UHF television broadcasting station?

Answer "It was" or "It was not".

ANSWER: It was.

If you have answered the preceding Interrogatory No. Fifteen (a) "It was", and only in such event, then you will answer the following Interrogatory.

(b) Do you find from a preponderance of the evidence that such lack of technical experience and training was a proximate cause of the damages, if any, resulting from the loss of plaintiff's television broadcasting business?

Answer "Yes" or "No".

ANSWER: No

## INTERROGATORY NO. SIXTEEN

(a) Do you find from a preponderance of the evidence that plaintiff was undercapitalized and lacked the financial capability to conduct a successful UHF television broadcasting station?

Answer "Yes" or "No".

ANSWER: No

If you have answered the preceding Interrogatory No. Sixteen (a) "Yes", and only in such event, then you will answer the following Interrogatory.

(b) Do you find from a preponderance of the evidence that such undercapitalization and lack of financial capability proximately caused the damages, if any, sustained by the plaintiff as a result of the loss of its television broadcasting business?

Answer "Yes" or "No".

ANSWER: No

### INTERROGATORY NO. SEVENTEEN

(a) Do you find from a preponderance of the evidence that the goods furnished to the plaintiff by the defendant were of a quality such as are generally sold in the market and suitable for that for which they are intended, or for the particular uses to which the goods are to be put?

Answer "Yes" or "No".

ANSWER: No

If you have answered the preceding Interrogatory No. Seventeen (a) "No", and only in such event, then you will answer the following Interrogatory.

(b) Do you find from a preponderance of the evidence that the failure of the defendant to supply goods of a quality such as are generally sold in the market and suitable for that for which they are intended, or for the particular uses to which the goods are to be put was a proximate cause of the damage, if any, sustained by the plaintiff as a result of the loss of its television broadcasting business?

Answer "Yes" or "No".

ANSWER: Yes

### INTERROGATORY NO. EIGHTEEN

Do you find from a preponderance of the evidence that the plaintiff, acting through its president, involuntarily signed promissory notes and the Conditional Sales Agreement of April 20, 1969, because of the coercive effect, if any, of the defendant's deliberate withholding, if any, of shipments to the plaintiff of items of equipment necessary for plaintiff to meet its alleged target on-the-air date of June 1, 1969?

Answer "Yes" or "No".

ANSWER: Yes

### INTERROGATORIES ON DAMAGES
### INTERROGATORY NO. ONE

From a preponderance of the evidence, what sum of money, if any, do you assess as actual damages sustained by the plaintiff, Fredonia Broadcasting Corporation?

Answer in dollars and cents.

ANSWER: Eight hundred and fifty thousand dollars

### INTERROGATORY NO. TWO

From a preponderance of the evidence, what sum of money, if any, do you assess as exemplary damages against RCA in favor of the plaintiff, Fredonia Broadcasting Company?

Answer in dollars and cents.

ANSWER: One hundred and fifty thousand dollars.

GEWIN, Circuit Judge (concurring in the result):

I concur in the result reached by my Brother Coleman in this case. In my view the district court committed errors with respect to its rulings and jury instructions as to the issues of liability and damages. Accordingly it is necessary for us to reverse the judgment and to remand the case for a new trial.